THE PHILADELPHIA AND TRENTON RAILROAD COMPANY, PLAIN-
TIFFS IN ERROR, *vs.* JAMES STIMPSON, DEFENDANT IN ERROR.

Action for the violation of a patent right, granted to the patentee for "a new and useful improvement in turning short curves on railroads."

On the 26th September, 1835, a second patent was granted, the original patent, granted in 1831, having been surrendered and cancelled on account of a defective specification; the second patent being for fourteen years from the date of the original patent. The second patent was in the precise form of the original, except the recital of the fact, that the former patent was cancelled " on account of a defective specification," and the statement of the time the second patent was to begin to run. It was objected that the second patent should not be admitted in evidence on the trial of the case, because it did not contain any recitals that the prerequisites of the act of Congress of 1836,' authorizing the renewal of patents, had been complied with. Held : that this objection cannot, in point of law, be maintained. The patent was issued under the great seal of the United States, and is signed by the President, and countersigned by the Secretary of State. It is a presumption of law, that all public officers, and especially such high functionaries, perform their proper official duties, until the contrary is proved. Where an act is to be done, or patent granted upon evidence and proofs to be laid before a public officer, upon which he is to decide, the fact that he has done the act, in granting the patent, is prima facie evidence that the proofs have been regularly made, and were satisfactory. No other tribunal is at liberty to re-examine or controvert the sufficiency of such proofs, when the law has made the officer the proper judge of their sufficiency and competency.

Patents for lands, equally with patents for inventions, have, in Courts of justice, been deemed prima facie evidence that they have been regularly granted, whenever they have been produced under the great seal of the government, without any recitals or proofs that the prerequisites of the acts under which they have been issued have been duly observed. In cases of patents, the United States have gone one step further; and as the patentee is required to make oath that he is the true inventor, before he can obtain a patent, the patent has been deemed prima facie evidence that he has made the invention.

It is incumbent on those who seek to show that the examination of a witness has been improperly rejected, to establish their right to have the evidence admitted ; for the Court will be presumed to have acted correctly, until the contrary is established.

To entitle a party to examine a witness in a patent cause, the purpose of whose testimony is to disprove the right of the patentee to the invention, by showing its use prior to the patent by others, the provisions of the patent act of 1836, relative to notice, must be strictly complied with.

It is incumbent on those who insist upon the right to put particular questions to a witness, to establish that right beyond any reasonable doubt, for the very purpose stated by them ; and they are not afterwards at liberty to desert that purpose, and to show the pertinency or relevancy of the evidence for any other purpose not then suggested to the Court.

A party has no right to cross-examine any witness, except as to facts and circumstances connected with the matters stated in his direct examination. If he wishes to examine him on other matters, he must do so by making the witness his own ; and calling him as such, in the subsequent progress of the cause. A party cannot, by his own omission to take an objection to the admission of improper evidence, brought out on a cross-examination, found a right to introduce testimony in chief, to rebut it or explain it.

Parol evidence, bearing upon written contracts and papers, ought not to be admitted in evidence, without the production of such written contracts or papers ; so as to enable both the Court and the jury to see whether or not the admission of the parol evidence in any manner, will trench upon the rule that parol evidence is not admissible to vary or contradict written contracts or papers.

As a general rule, and upon general principles, the declarations and conversations of the plaintiff are not admissible evidence in favour of his own rights. This is, however, but a general rule, and admits and requires various exceptions. There are many cases in which a party may show his declarations comport with acts in his own favour, as a part

of the res gestæ. There are other cases in which his material declarations have been admitted.

In an action for an assault and battery and wounding, the declarations of the plaintiff to his internal pains, aches, injuries, and symptoms, to the physician attending him, are admissible for the purpose of showing the nature and extent of the injuries done to him. In many cases of inventions, it is hardly possible in any other manner to ascertain the precise time and exact origin of the invention.

The conversations and declarations of a patentee, merely affirming that at some former period he had invented a particular machine, may well be objected to. But his conversations and declarations, stating that he had made an invention, and describing its details, and explaining its operations, are properly deemed an assertion of his right, at that time, as an inventor, to the extent of the facts and details which he then makes known, although not of their existence at an anterior time. Such declarations, coupled with a description of the nature and objects of the invention, are to be deemed a part of the res gestæ, and legitimate evidence that the invention was then known and claimed by him; and thus its origin may be fixed at least as early as that period.

If the rejection of evidence is a matter resting in the sound discretion of the Court, this cannot be assigned as error.

The mode of conducting trials, the order of introducing evidence, and the times when it is to be introduced, are properly matters belonging to the practice of the Circuit Courts, with which the Supreme Court ought not to interfere; unless it shall chose to prescribe some fixed general rules on the subject, under the authority of the act of Congress. The Circuit Courts possess this discretion in as ample a manner as other judicial tribunals.

Testimony was not offered by a defendant, or stated by him as matter of defence, in the stage of the cause when it is usually introduced according to the practice of the Court. It was offered after the defendant's counsel had stated, in open Court, that they had closed their evidence, and after the plaintiff, in consequence of that declaration, had discharged his own witness. The Circuit Court refused to admit the testimony. Held, that this decision was proper.

IN error from the Circuit Court of the United States for the Eastern District of Pennsylvania.

At the April session of the Circuit Court, James Stimpson instituted an action against the plaintiffs in error, for the recovery of damages, for the violation of a patent granted to him by the United States, on the 26th day of September, 1835, for "a new and useful improvement in the mode of turning short curves on railroads."

The case was tried on the 16th day of February, 1839; and a verdict was rendered for the plaintiff, for the sum of four thousand two hundred and fifty dollars. On the 6th of May, 1839, a remittiter was entered on the docket of the Court, for the sum of one thousand dollars; and a judgment was entered for the plaintiff for three thousand two hundred and fifty dollars.

On the trial of the cause, the defendants tendered a bill of exceptions to the decision of the Court, on their admitting the patent to the plaintiff in evidence; and to other rulings of the Court in the course of the trial. The defendants prosecuted this writ of error.

The patent granted by the United States to James Stimpson was as follows:

"The United States of America; to all to whom these letters patent shall come.

"Whereas, James Stimpson, a citizen of the United States, hath alleged that he has invented a new and useful improvement in the

mode of turning short curves on railroads, for which letters patent were granted the twenty-third day of August, 1831; which letters being hereby cancelled on account of a defective specification; which improvement, he states, has not been known or used before his application, hath made oath that he does verily believe that he is the true inventor or discoverer of the said improvement, hath paid into the treasury of the United States, the sum of thirty dollars, delivered a receipt for the same, and presented a petition to the Secretary of State, signifying a desire of obtaining an exclusive property in the said improvement, and praying that a patent may be granted for that purpose. These are, therefore, to grant according to law, to the said James Stimpson, his heirs, administrators, or assigns, for the term of fourteen years from the twenty-third day of August, 1831, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given in the words of the said James Stimpson himself, in the schedule hereto annexed."

Tested at Washington, under the seal of the United States, on the 26th day of September, 1836, by the President of the United States; and certified in the usual form by the Attorney General of the United States.

"The schedule referred to in these letters patent, and making a part of the same," contained "a description in the words of the said James Stimpson himself, of his improvement in the mode of turning short curves on railroads, for which letters patent were granted, dated the twenty-third day of August, 1831, which letters patent being hereby cancelled, on account of a defective specification."

The specification describes the invention with minute particularity, and concludes: "What I claim as my invention, or improvement, is the application of the flanches of the wheels on one side of railroad carriages, and of the treads of the wheels on the other side, to turn curves upon railways, particularly such as turning the corners of the streets, wharves, &c., in cities and elsewhere, operating upon the principle herein set forth."

The bill of exceptions stated, that the counsel for the plaintiff offered in evidence the patent and specification, to the admission of which in evidence, the counsel for the defendant objected; but the objection was overruled by the Court, and the evidence was admitted.

2. The defendants offered to give in evidence, by Josiah White, the description of a flange upon one side of the railroad cars, and the running upon the tread of the wheel upon the other side, with the flange in a groove, for the turning of curves, which he had seen in use before the date of plaintiff's patent; which was objected to by the counsel for the plaintiff, and the objection sustained by the Court. The objection of the counsel for the plaintiff to the introduction of the testimony of Josiah White, was founded on the ab-

[The Philadelphia and Trenton Railroad Company *vs.* Stimpson.]

sence of the notice required by the act of Congress of the use of the machine at Mauch Chunk; at which place, it was said, his testimony would show it had been used.

3. The third exception was to the refusal of the Court to allow the defendants to introduce proof of the conversations between the patentee and the counsel of the Baltimore and Ohio Railroad Company, while an arrangement of a suit against the Company was made, as to the character and effects of the arrangements.

4. The counsel for the plaintiff, by rebutting evidence, to extend his claim to the invention prior to the time at which the defendants had proved the reduction of the same into use and practice by others, offered to give evidence by witnesses of the conversations of the patentee on the subject of his invention at an anterior period; which conversations were intended to show the making of the invention by the patentee, before and at the period when the same took place. The counsel for the defendants objected to the admission of this testimony; but the Court overruled the objection.

5. The fifth exception was to the refusal of the Court to admit the examination of Dr. Thomas P. Jones. The plaintiff had discharged his witnesses on the declaration of the defendants' counsel that they had closed their evidence. The testimony asked from Dr. Jones, was to new facts. The Court refused to admit the testimony, on the ground that the testimony was improper, and that it was offered too late.

The case was argued by Mr. Coxe, and Mr. Southard, for the plaintiffs in error; and by Mr. J. R. Ingersoll, for the defendant.

Mr. Coxe and Mr. Southard, on the first exception.

The patent should not have been admitted in evidence. On its face it is inoperative, and invalid. It is not a patent under the act of Congress of 1793; but it purports to be a substituted patent for one which had been surrendered. It gives to the patentee the same privileges as those which were given by the first patent. It, therefore, should be in strict and exact conformity with the law of 1793, as well as with the subsequent act of Congress, authorizing the surrender of a patent for an imperfect specification, and the issue of another.

The act of 21st February, 1793, requires, by its third section, that the applicant shall be the true inventor of the machine, &c. This is made a sine qua non to the granting the patent, and the oath of the claimant is required to this fact. This provision makes the oath necessary, before the Secretary of State has authority to grant the patent. There is no remedy, if this has been omitted.

There was no decision before the case of Morris *vs.* Huntington, Paine's Reports, 348, which affirmed the right of a patentee to surrender his patent for an erroneous or imperfect specification. After this case, Congress authorized such a surrender. Act of Congress

of July 3d, 1832. By this act the cause of the surrender must be made out to the satisfaction of the Secretary of State, when a second patent is asked for. It has been decided, that a patent is prima facie evidence of the statements on the face of the patent. This does not give any other validity to those statements; and it is not sufficient that some of the requirements of the act of Congress are stated. All must be set forth, and an averment must be made that every thing has been done. There is no halting point. Those requirements exist as to any patent granted after the surrender of a patent. The errors or imperfections in the specification, on which the surrender has been made, should be stated. Grant *vs.* Raymond, 6 Peters, 218. In the case cited, there was a recital of the surrender of the patent, and the cause of its surrender.

There is in the patent which was before the Circuit Court, no recital of the imperfections of the first specification; no allegation that there was no fraud in the transaction. There is nothing shown but the gratuitous act of the officer in granting the second patent. And yet all the prerequisites to the granting of a second patent should appear in it, as well as be of record in the patent office.

Without these essential features in a patent given on the surrender of a previous one for the same invention, it cannot be read in evidence to a jury. The requirements in both the acts of Congress of 1792, and 1832, must appear in it. If all those matters are not shown, the second patent stands as a new patent : and by allowing it to be given in evidence, the Court altogether disregard the law. If the patent, in this imperfect form, is admitted as prima facie proof, all the burden of contradicting it is thrown on the opposite party. Cited, on these points, Shaw *vs.* Cooper, 7 Peters, 245.

In support of the second exception, the counsel contended that the notice given was sufficient to authorize the introduction of the testimony of Josiah White. Cited, on this point, Evans *vs.* Eaton, Peters' C. C. R. 322. Wheat. Rep. S. C. The notice would have been sufficient under the act of Congress of 1793, and why not under the act of July 3d, 1836 ?

The objection to the introduction of the evidence by the counsel for the defendants, which was sustained by the Court, and which is the subject of the defendants' third exception, was well taken. It was in the power of the plaintiff to have produced his contract with the Baltimore and Ohio Railroad Company, and have rendered this evidence unnecessary. He did not do so.

As to the fourth exception. It is admitted, that it was the right of the plaintiff to prove, by legal rebutting evidence, that the invention made by him, and for which he held the patent, was in use before the period in which the defendant had proved the invention by him. But this evidence could not be given, by showing the conversations of the plaintiff on the subject of the invention before the date of the first patent.

Conversations on the subject of an invention are not the inven-

tion; nor are the ideas of the invention, its actual development. There must be an application of the thought, in the construction of the machine.

This is an attempt to give the declarations of a party in evidence, after the actual occurrence of the transaction. No declaration of a person that he intended to take out a patent, could be given in evidence. Cited, on this point, 1 Wheat. Rep. 313. 10 Serg. and Rawle, 27. 5 Serg. and Rawle, 295. Roscoe on Evidence, 21. 4 Washington C. C. R. 58. 5 Mason, 6. 1 Gallis, C. C. R. 438.

As to the fifth exception, the counsel contended, that the evidence of Dr. Jones was rebutting evidence, and was regular; as it was offered to meet and to disprove the plaintiff's declarations, which the Court had admitted as testimony.

Mr. Ingersoll, for the defendants in error.

1. The objection to the certificate of the Secretary of State should apply rather to the effect than the admissibility of the document. That officer is authorized by law to issue patents, and the presumption is, that he has done so rightfully. Possession of the document does not affect the intrinsic rights of any one. Every question of merit is still open. It enables the patentee to sue; but it neither secures him in the enjoyment of the alleged invention, nor precludes others from contesting the validity of his claims. In the different cases cited, the patent appears to have been received in evidence exactly in the form now exhibited, although it may have availed nothing to the plaintiff afterwards.

Sullivan vs. Redfield, 1 Paine, 447: "The patent is prima facie evidence of the right." The Margaretta, 2 Gall. 519: Remission, though not valid, was given in evidence. See also Bingham vs. Cabot, 3 Dall. 19. Bell vs. Morrison, 1 Peters, 355. Keene vs. Meade, 3 Peters, 6. The United States vs. Liddle, 2 Wash. C. C. Rep. 205.

2. The testimony of Josiah White would have been admitted under the sixth section of the law of 1793. But the fifteenth (or corresponding) section of the law of 1836, requires notice of place, person, and residence. As the law previously stood, great injustice might have been done, unless the Court had construed it so as to invest the judge with power to prevent the plaintiff from being taken by surprise. Evans vs. Eaton, 3 Wheat. 505. The law now wisely anticipates the necessity for an exercise of judicial discretion and possible delay; and requires notice of the place where the improvement is supposed by a defendant to have been previously used. This was not given, and the testimony was necessarily rejected.

3. Although, in truth, the offer to examine Mr. Latrobe upon certain points was not rejected by the Court, but withdrawn by the counsel, yet as it appears by the record to have been a point decided, I will submit to treat it accordingly. The testimony would no doubt have been rejected if the offer had been persisted in, and the delay

that would be requisite to put the record right would be deeply injurious to my client.

(1.) The inquiries suggested for the witness are impracticable, and they lead to impracticable results. The inquiry refers to a "negotiation," "arrangement," and "settlement." It asserts the fact that a "grant" or "contract," was made. Negotiation is the necessary preliminary to a contract, is absorbed in it, and forms a part of it. How can you separate them? Out of one identified existence, two things are to be made, essentially distinct from each other. That is impossible.

(2.) The inquiries are irrelative. The arrangement contemplated was res inter alios acta. The plaintiffs in error were altogether strangers to it. Many inducements may lead to a settlement with one person which would not render it desirable with another. If it were not that Ross Winans had previously been cross-examined by the counsel for the plaintiffs in the Circuit Court, to the point of settlement with the Baltimore and Ohio Company, no pretence for the inquiry would exist. If that was wrong, this will not make it right. It was not objected to. If not strictly cross-examination, we had no right to resort to it. Ellmaker *vs.* Buckley, 16 Serg. and Rawle. If it was regular cross-examination, it cannot justify the proposed irregularity. But we were bound to put the witness on his guard as to a collateral fact which might impeach his testimony. Rule in the Queen's case.

(3.) The object attempted to be proved was a mere entity; an abstraction: nothing actually done, but at best something omitted or avoided: a conclusion or construction: a contingency without a substantial thing to support it.

(4.) It was an attempt to prove by parol some known written arrangement, which was susceptible of being produced.

4. Explanations of the patentee himself were good evidence to prove the genuineness of his claims to originality. It is necessary to understand the manner in which this testimony was produced. Plaintiff at first simply produced his patent, and called a witness who proved its utility and the infringement by the defendants. Then the defendants went at large into proof of alleged priority of invention by other persons. All of this went to show a use before the date of the plaintiff's patent. A necessity was therefore thrown upon him of proving that his invention existed, and was communicated by him to different persons at a still earlier period. No doubt of the importance of such proof. It consisted of evidence of plaintiff's invention prior to defendants' knowledge, or the knowledge of those persons on whom they relied. To meet this particular exigency, that is, to show invention, it is difficult to conceive what can be authentic except what comes from the inventor himself. He therefore produced several individuals, who stated that he described the improvement to them at a period considerably earlier than defendants had fixed for its earliest use. If he described it, he must have known it. If he knew it before any other person, he must

have invented it. That prior knowledge was invention; and that was the very thing to be proved.

Two objections were taken to the character of the proof: 1st. That it was derived from the plaintiff himself; 2d. That the alleged improvement was not then brought into practical use by him.

. Answer Ist. It was an invention; else not patentable: in other words, it must spring from himself. An exhibition of it must necessarily in some shape or other be his act. Whatever might be said or done by others could not be available to him. The exhibition might be effected by deeds, signs, or words. It matters not in what particular manner the effect is produced, but the discovery must make manifest its paternity; and it can do so only through the medium of its proper parent.

This may be done by his works—a machine constructed. Let it be produced; original, practical, perfect in all its parts. Nothing is gained by the author unless something more than all this appears, viz. authorship. However eloquent the machine may be as to its uses, it cannot speak for itself, as to its author. The nearest it can come to speech would be an inscription or label on its front: "J. S. fecit," for example.

. That would at best be a written declaration. What difference would it make that the writing, or stamping, or printing, should be in a book? That description of evidence in a sister department of the law, is conclusive of important rights. In maintaining copyrights, the writing of the party is the essence of the discovery, and the sole proof of invention or originality. If, instead of writing with his own hand, the same author dictates to another person, cannot the amanuensis prove the dictation, and hence the authorship? A blind author has often given to the world the result of his genius, through the pen of another. On a question of authorship, surely the testimony of the scribe would be received as competent.

Another species of proof of invention remains, namely, oral explanation alone. Why may it not be received? It is the very thing itself. To speak it, was to create it, if it did not already exist in thought; and if it did, it must prove it. The proof was given to counteract the allegation of earlier discovery. It produces the effect by showing that the earlier discoverers, as they are regarded, received from the plaintiff the information which enabled them to put the invention in use, and then attempt to deny the right of showing how the information was communicated and obtained. One of the very pieces of testimony objected to consisted of a conversation with the person who claimed to be an inventor in preference to the plaintiff.

The declarations did not stand alone; they were accompanied by two drawings and a model. The date of the existence of these monuments is clearly proved. The conversations became but a part of the res gestæ.

There are many occasions on which one's own sayings and doings are good evidence; in some instances the best, and in others the only

evidence. The present is an anomaly unless it concurs. It does not follow that the expressions of an individual are the illegal creation of testimony for himself. Such are, 1. Various kinds of declarations ante litem motam; 2. When the sayings are the doings, as in cases of notice; 3. Where the expressions of an individual are the test of a given state of things, as intellect; 4. Proof of a contract, as marriage, by words de presenti; 5. Almost any other discovery or invention, not connected with the useful arts. A reward is offered for lost property: the finder informs of the finding of it: the declarations can be proved.

Answer 2d. As to the objection that the explanations were not reduced to practice. Here, too, the objection loses sight of the fact that our evidence was not original, but merely designed to meet a collateral issue as to the period of invention, and not exactly as to invention itself. On any ground, however, the question of invention does not depend upon whether the thing has been reduced to practice, but whether it can be. Not whether it is actually practised, but practicable. Drawings, descriptions, and models are sent to the patent office. These are miniature likenesses, not the thing itself. Any other course would, in many instances, be quite impracticable. A ship, a house, a town, are often the recipients of an improvement which cannot be practically exhibited, except in connection with the vast object to which it is applied. Sometimes the reducing to practice might be destructive of life or property. A guillotine need not be rehearsed in order to prove its power.

Besides, it might destroy the very intention, to insist on practical exercise. It might be regarded as giving the invention to the public, and then the patent right is gone forever.

5. Thomas P. Jones was called by the defendants after all the testimony in chief, on both sides; and the plaintiff's rebutting testimony also had been given, and his witnesses dismissed; and much time had been occupied in giving rebutting testimony for the defendants. The declared object was to prove that the invention described in the plaintiff's patent of 1835, was different from the invention described by him in his patent of 1831: in other words, that the patent which purported to be a mere correction of form, was in substance a totally different thing. We are struck at once with an inconsistency between this point, and the whole tenor of the defendants' case. The notice which they gave, the aim of their evidence, their great design, is to show that the thing relied on by the plaintiff, which was patented by him in 1835, was well known and used in 1831; known to everybody, publicly, notoriously. Yet we are now told that it was not known even to the plaintiff himself; but that he found it necessary four years afterwards to desert the alleged invention of 1831, and surreptitiously to foist in a different thing, which then became known to him for the first time. Unless this is the true meaning of the point, it has none.

The evidence offered was original and direct. It contradicted nothing already asserted in evidence. It was directed to a point in

no way collateral.  It went immediately to the essential merits of the case.  It was of great importance, undoubtedly.  Nothing could be more conclusive against the plaintiff.  Not only would it be destructive of his claim to originality; but it would prove a most audacious fraud, abortively attempted, and calculated, when detected, to deprive him of all standing in or out of Court, and to render his defeat as disgraceful as it was inevitable.

Notice of all this ought to have been given, perhaps.  It is not urged, however, as an argument, that none was received; although it might have been calculated to take the plaintiff by surprise.  But it was a fact above all others, requiring, and in its nature admitting of countervailing proof.  Not a clerk in the office, probably, could have failed to give material testimony in reply.  These persons were at a distance ; and we should have been left to the question of probability, whether a man, in any extremity of impudent-fraud, would have ventured to place two totally different patents side by side in the office, asserting that they were in substance identical.

The evidence offered was not the best the nature of the case admitted of.  Contradiction was to be proved between two written instruments, with, perhaps, a model accompanying each of them.  Copies would be the proper sources of illustration.  Were copies not accessible?  We do not know.  No inquiry was made.  A thousand copies may have been made before the patent office was destroyed.  Plaintiff himself, no doubt, had such copies in his possession.  No notice was given to him to produce them, before this violent attempt was made to introduce secondary evidence.

To get rid of all this, the argument was that the difference was only to be inferred between the patents from a difference between the conversation and one of them.  But that would rebut nothing.  No person denied that plaintiff's conversations with the witnesses he produced, were as they were sworn to be.  Other conversations with other persons might show descriptions of other inventions; but they could not possibly show that the first conversations did not take place.  The judge gave two reasons for rejecting the testimony.  One was, that it was offered at too late a stage of the cause.  That was ruled in his sound discretion.  From the exercise of that discretion there is no appeal.  No attempt was made to take one.  On both of his grounds he was right.  But one was sufficient to cover the whole question, and it is inaccessible to review here.

Mr. Justice STORY delivered the opinion of the Court.

This is a writ of error to the judgment of the Circuit Court for the Eastern District of Pennsylvania, rendered in an action brought by Stimpson, the defendant in error, against the plaintiffs in error, for a violation of a patent right granted to him for a new and useful improvement in the mode of turning short curves on railroads.

A patent was originally granted to Stimpson, for the same invention, on the 23d day of August, 1831 ; and the renewed patent, upon which the present suit is brought, was granted on the 26th of

September, 1835, upon the former letters patent "being cancelled on account of a defective specification;" and the renewed patent was for the term of fourteen years from the date of the original patent. With the exception of the recital of the fact that the former letters patent were cancelled "on account of a defective specification," and the statement of the prior date from which the renewed patent was to begin to run, the renewed patent is in the precise form in which original patents are granted.

At the trial upon the general issue, a bill of exceptions was taken to certain rulings of the Court upon points of evidence, to the consideration of which we shall at once proceed without any further preface.

The first exception taken is to the admission of the renewed patent as evidence in the cause to the jury. The patent act of 1832, ch. 162, sec. 3, under which this patent was obtained, provides, that whenever any patent shall be inoperative or invalid, by reason that any of the terms or conditions prescribed by the prior acts of Congress, have not, by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, been complied with on the part of the inventor, it shall be lawful for the Secretary of State, upon the surrender to him of such patent, to cause a new patent to be granted to the inventor, for the same invention, for the residue of the period then unexpired for which the original patent was granted, upon his compliance with the terms and conditions prescribed by the third section of the act of the 21st of February, 1793, ch. 55.

Now, the objection is, that the present patent does not contain any recitals that the prerequisites thus stated in the act have been complied with, viz. that the error in the former patent has arisen by inadvertency, accident, or mistake, and without any fraudulent or deceptive intention; and that without such recitals, as it is the case of a special authority, the patent is a mere nullity, and inoperative. We are of opinion that the objection cannot, in point of law, be maintained. The patent was issued under the great seal of the United States, and is signed by the President, and countersigned by the Secretary of State. It is a presumption of law, that all public officers, and especially such high functionaries, perform their proper official duties until the contrary is proved. And where, as in the present case, an act is to be done, or patent granted upon evidence and proofs to be laid before a public officer, upon which he is to decide, the fact that he has done the act or granted the patent, is prima facie evidence that the proofs have been regularly made, and were satisfactory. No other tribunal is at liberty to re-examine or controvert the sufficiency of such proofs, if laid before him, when the law has made such officer the proper judge of their sufficiency and competency. It is not, then, necessary for the patent to contain any recitals that the prerequisites to the grant of it have been duly complied with, for the law makes the presumption; and if, indeed, it were otherwise, the recitals would not help the case without th

auxiliary proof that these prerequisites had been, de facto, complied with.   This has been the uniform construction, as far as we know in all our Courts of justice upon matters of this sort.   Patents for lands, equally with patents for inventions, have been deemed prima facie· evidence that they were regularly granted, whenever they have·been produced under the great seal of the government; without any recitals or proofs that the· prerequisites of the acts under which they have been issued have been duly observed.   In cases of patents, the Courts of the United States have gone one step further, and as the patentee is required to make oath that he is the true inventor, before he can obtain a patent, the patent has been deemed prima facie evidence that he has made the invention.   This objection, then, is overruled; and there was no error in the Circuit Court in the admission of the patent.

The next exception is to the refusal of the Court to allow a witness, Josiah White, to give a description of an invention which he had seen on the Mauch Chunk railroad, in 1827, which had a groove on one side, and run on the other on a flange for crossing, for the purpose of showing that the supposed invention of the plaintiff was known and in use by others, before the date of his patent.   By the patent act of 1836, (which was applicable to the present point,) it is provided in the fifteenth section, that whenever the defendant relies in his defence on the fact of a previous invention, knowledge, or use of the thing patented, he shall state in his notice of special matter to be used in his defence, the names and places of residence of those, whom he intends to prove to have possessed ·a prior knowledge of the thing, and where the same had been used. The object of this most salutary provision is to prevent patentees being surprised at the trial of the cause, by evidence of a nature which they could not be presumed to know, or be prepared to meet, and thereby to subject them either to most expensive delays, or to a loss of their cause.   It is incumbent on those who seek to show that the examination of a witness has been improperly rejected, to establish their right to have the evidence admitted; for the Court will be presumed to have acted correctly, until the contrary is established.

In the present case, there is no proof on the record that notice had been given according to the requirements of the statute, that White was to be a witness for the purpose above stated.   Unless such notice was given, it is plain that the examination could not be rightfully had.   The onus probandi is on the defendants to show it, and unless they produce the notice, the objection must fail.   In point of fact, it was admitted by counsel, at the argument, that no such notice was given.   In either view, then, from the admission, or from the defect of the preliminary proof of notice in the record, the exception is not maintainable.

The next exception is to the refusal of the Court to allow certain questions to be put by the defendants to John H. B. Latrobe, a witness introduced by the defendants to maintain the issue on their part.   Latrobe, on his examination, stated, "I know Mr. Stimpson

by sight and character. He granted to the Baltimore and Ohio Railroad Company the privilege of using the curved ways on their railroad, and all lateral roads connected therewith. I fix the date of the contract in the early part of October, 1834, because I have then a receipt of Mr. Stimpson's counsel, for two thousand five hundred dollars. Mr. Stimpson laid his claim against the Baltimore Company for an infringement of his patent, in 1832. It was referred to me by the Company, and I advised them." The counsel for the defendants then offered to prove by the same witness, the declarations of the plaintiff and his agent, to the witness, that the settlement made with the Baltimore and Ohio Railroad Company with the plaintiff, was not an admission by the said company of the plaintiff's right in the alleged invention, but a mere compromise of a pending suit, disconnected with a grant, in writing, made by the plaintiff to the said company; and to that end proposed to put the following questions, respectively, and in order, to the witness: " 1. Do you know who was the agent or attorney of James Stimpson, in negotiating the arrangement and settlement between him and the company referred to ? Who was he ? 2. State if any conversations occurred between James Stimpson, or his agent or counsel, at any time, during the negotiations, regarding the rights claimed by him in the patent for curved ways, without reference to the existence of a written contract, or its contents ? 3. What were they ?" The Court refused to allow these questions to be put, for the purpose aforesaid.

Now, (as has been already intimated,) it is incumbent upon those who insist upon the right to put particular questions to a witness, to establish that right beyond any reasonable doubt, for the very purpose stated by them; and they are not afterwards at liberty to desert that purpose, and to show the pertinency or relevancy of the evidence for any other purpose, not then suggested to the Court. It was not pretended at the argument, that the evidence so offered was good evidence in chief, in behalf of the defendants upon the issue in the cause. It was res inter alios acta, and had no tendency to disprove the defendant's title to the invention, or to support any title set up by the defendants; for no privity was shown between the defendants and the Baltimore Company. As evidence in chief, therefore, it was irrelevant and inadmissible. The sole purpose for which it was offered, so far as it was then declared to the Court, was to show, that the compromise with the Baltimore Company was not founded on any admission of the plaintiff's right in the invention. Be it so; it was then inconsequential; for it certainly had no just tendency to disprove his right. If the compromise had been offered on the part of the plaintiff, for the purpose of establishing his right to the invention, there is no pretence to say that it would have been admissible against the defendants. In the converse case, it is equally inadmissible for the defendants.

But it is now said that the evidence was in fact offered for the purpose of rebutting or explaining certain statements made by one

Ross Winans, a witness called by the defendants, in his answers upon his cross-examination by the plaintiff's counsel. Now, this purpose is not necessarily, or even naturally, suggested by the purpose avowed in the record. Upon his cross-examination, Winans stated: " I understood there were arrangements made with the Baltimore Company. I heard the Company paid five thousand dollars." Now, certainly these statements, if objected to by the defendants, would have been inadmissible upon two distinct grounds. 1. First, as mere hearsay; 2. And, secondly, upon the broader principle, now well established, although sometimes lost sight of in our loose practice at trials, that a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his direct examination. If he wishes to examine him to other matters, he must do so by making the witness his own, and calling him, as such, in the subsequent progress of the cause. The question then is presented, whether a party can, by his own omission to take an objection to the admission of improper evidence brought out on a cross-examination, found a right to introduce testimony in chief to rebut it or explain it. If upon the cross-examination, Winans' answer had been such as was unfavourable to the plaintiff, upon the collateral matters thus asked, which were not founded in the issue, he would have been bound by it, and not permitted to introduce evidence to contradict it. There is great difficulty in saying that the defendants ought to be in a more favoured predicament, and to acquire rights founded upon the like evidence to which they did not choose to make y objection, although otherwise it could not have been in the cause. But waiving this consideration, the grounds on which we think the refusal of the Court was right, are; first, that it was not distinctly propounded to the Court, that the evidence was offered to rebut or explain Winans' testimony; and, secondly, that in the form in which it was put, it proposed to separate the written contract of compromise from the conversations and negotiations which led to it, and to introduce the latter without the former, although it might turn out that the written paper might most materially affect or control the presumptions deducible from those conversations, and negotiations. We think, that upon the settled principles of law, parol evidence bearing upon written contracts and papers, ought not to be admitted without the production of such written contracts or papers, so as to enable both the Court and the jury to see whether or not the admission of the parol evidence in any manner will trench upon the rule, that parol evidence is not admissible to vary or contradict written contracts or papers.

The next exception is to the admission of the evidence of William A. Stimpson, Richard Caton, and George Neilson, as to certain declarations, and statements, and conversations of the plaintiff, as to his invention prior to the date of his original patent; in order to rebut the evidence of the defendants, as to the invention or use by other persons of the same contrivance, before that date. The ob-

jection is, that, upon general principles, the declarations and conver·
sations of a plaintiff, are not ·admissible evidence in favour of his
own rights.  As a general rule, this is undoubtedly true. · It is,
however, but a general rule, and admits, and requires various ex-
ceptions.  There are many cases in which a party may show his
declarations conflict with acts in his own favour, as a part of the
res gestæ.  There are other cases, again, in which his material de-
clarations have been admitted.  Thus, for example, in the case of
an action for an assault and battery, and wounding, it has been
held, that the declarations of the plaintiff, as. to his internal pains,
aches, injuries, and· symptoms, to the physician called to prescribe
for him, are admissible for the purpose of showing the nature and
extent of the injuries done to him.  See 1 Phillips on Evidence,
ch. 12, sec. 1, p. 200—202, eighth ed., 1838.  In many cases of in-
ventions, it is hardly possible in any other manner to ascertain the
precise time and exact origin of the particular invention.  The in-
vention itself is an intellectual process or operation; and, like all
other expressions of thought, can in many cases scarcely be made
known, except by speech.  The invention may be consummated
and perfect, and may be susceptible of complete description in
words, a month, or even a year before it can be embodied in any
visible form, machine, or composition of matter.  It might take a
year to construct a steamboat, after the inventor had completely
mastered all the details of his invention, and had fully explained
them to all the various artisans whom he might employ to construct
the different parts of the machinery.  And yet from those very de-
tails and explanations, another ingenious mechanic might be able to
construct the whole apparatus, and assume to himself the priority
of the invention.  The conversations and declarations of a patentee,
merely affirming that at some former period he invented that parti-
cular machine, might well be objected to.  But his conversations
and declarations, stating that he had made an invention, and de-
scribing its details and explaining its operations, are properly to be
deemed an assertion of his right, at that time, as an inventor to the
extent of the facts and details which he then makes known; al-
though not of their existence at an antecedent time.  In short, such
conversations and declarations, coupled with a description of the
nature and objects of the invention, are to be deemed a part of the
res gestæ; and legitimate evidence that the invention was then
known to and claimed by him, and thus its origin may be fixed at
least as early as that period.  This view of the subject covers all
the parts of the testimony of the witnesses objected to in the Cir-
cuit Court; and we are of opinion, that the Court were right in ad-
mitting the evidence.

The next and last exception is, to the rejection of the evidence
of Dr. Jones, who was offered to prove that there were material
differences between the patent of 1831, and the renewed patent of
1835, and to explain these differences.  No doubt can be entertained
that the testimony thus offered was, or might be, most material to

the merits of the defence. And the question is not as to the competency or relevancy of the evidence, but as to the propriety of its being admitted at the time when it was offered. It appears that the testimony was not offered by the defendants, or stated by them as a matter of defence, in the stage of the cause when it is usually introduced according to the practice of the Court. It was offered after the defendants' counsel had stated in open Court, that they had closed their evidence, and after the plaintiff, in consequence of that declaration, had discharged his own witnesses. The question, then, is, whether it was at that time admissible on the part of the defendants as a matter of right; or whether its admission was a matter resting in the sound discretion of the Court. If the latter, then it is manifest that the rejection of it cannot be assigned as error.

The mode of conducting trials, the order of introducing evidence, and the times when it is to be introduced, are, properly, matters belonging to the practice of the Circuit Courts, with which this Court ought not to interfere ; unless it shall choose to prescribe some fixed, general rules on the subject, under the authority of the act of Congress. Probably the practice in no two states of the Union is exactly the same ; and ther·ore, in each state, the Circuit Courts must necessarily be vested with a large discretion, in the regulation of their practice. If every party had a right to introduce evidence at any time, at his own election, without reference to the stage of the trial in which it is offered, it is obvious that the proceedings of the Court would often be greatly embarrassed, the purposes of justice be obstructed, and the parties themselves be surprised by evidence destructive of their rights, which they could not have foreseen, or in any manner have guarded against. It seems to us, therefore, that all Courts ought to be, as indeed they generally are, invested with a large discretion on this subject, to prevent the most mischievous consequences in the administration of justice to suitors; and we think that the Circuit Courts possess this discretion in as ample a manner as other judicial tribunals. We do not feel at liberty, therefore, to interfere with the exercise of this discretion; and, indeed, if we were called upon to say upon the present record, whether this discretion was, in fact, misapplied or not, we should be prepared to say, that we see no reason to doubt that it was, under all the circumstances, wisely and properly exercised. It is sufficient for us, however, that it was a matter of discretion and practice, in respect to which we possess no authority to revise the decision of the Circuit Court.

Upon the whole, we are of opinion, that the judgment of the Circuit Court ought to be affirmed with costs.