Mr. Justice MacArthur
delivered the opinion of the court:
The appeal in this case is from a decision of the Commissioner of Patents, refusing to grant a re-issue of a patent to the representatives of a deceased inventor. The refusal to allow the re-issue is placed by the Commissioner on the ground that the claims for which the re-issue is denied have been abandoned to the public use, and are therefore not patent, able. The facts of the case are as follows:
Daniel S. Stafford made application for letters-patent August 30, 1860, for a new and useful improvement in corn-cultivators, which he described in his specification as that kind of cultivator that can be raised or lowered, or turned to the right or left by the operator, from his seat on the machine, so as to -adapt the machine for passing over or turning to one side of an obstruction, or to cause it to follow the crooks in the rows of plants. And this is followed by an elaborate description of the invention in all its details. The original patent was issued to him January 15, 1861, embracing three claims: first, the combination which enabled the driver to guide the machine so as to follow the crooks in the row of plants; second, the combination of the seat and the bent axle; and third, the long bent share-blades or cutters, for the purpose of throwing the loosened soil toward the plants.
In 1866 Daniel S. Stafford died, and on the 13th of September, 1870, his assignee, and his widow, who has since married, and is now Mrs. Conklin, filed an application for a re-issue, embracing seven claims, five of which were allowed, and two *378 of which were rejected for the reason already mentioned, that Stafford had abandoned the subject-matter of such claims previous to the issuing of the original patent. These claims are in the following language:
“The combination, in a straddle-row cultivator, of two wheels, B, an axle, C, frame A, and series of plows G, arranged in two gangs, with a central space between the gangs, so as to till or cultivate the soil on both sides of a single row of plants, simultaneously, as set forth.
“Also the combination, in a straddle-row cultivator, of two wheels, B, an axle, C, frame A, series of plows G, arranged in two gangs, with a central space between the gangs, and a seat, E, for the driver, for the purposes set forth.”
The application for the re-issue was necessarily made under the 53d section of the revised patent-law of 1870, which seems to be the only provision in the statute authorizing the Commissioner to issue a new patent for the same invention. This section declares that whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the Commissioner is authorized on the surrender of such patent to cause a new one to be issued with corrected specifications. It will be seen by the terms of the statute that, in order to entitle a party to the re-issue of a patent, it is incumbent on him to show that it is inoperative or invalid, by reason of a defective or insufficient specification, or that the patentee had claimed more than he invented, and that the error had arisen by inadvertence, accident, or mistake, and without any fraudulent intention. Unless these circumstances exist in an application of this character, I can find no authority by which the Commissioner can re-issue a patent, and as he is an officer of special and limited power, his action must be restricted to the particular cases mentioned in the statute. I refer to these requirements of law because, if the original patent is neither inoperative nor invalid, and if no error has been occasioned by accident or mistake, there must be a presumption of law and fact that *379 the patentee has abandoned to the use of the public everything which he may have invented, but which he did not include in his claims and specifications. The law presumes that every one who applies for a patent will embody his invention in specifications sufficiently definite to preserve as much of his discovery as he desires to protect by a patent. If from mistake he has overlooked anything within the scope of his invention, he may surrender his patent on that ground, and claim a new one in accordance with amended specifications. The party asking this relief must be denied it, unless he brings himself within the statute. When he knows all the facts relating to his own case, but through culpable negligence or misconduct has failed to claim all of Ms discovery, the law will not extend its aid to him, but will leave him to enjoy only such limited advantages as he has actually secured. The law reserves its remedies for the careful and vigilant who may have been misled from any of the causes mentioned in the statute. Courts of equity very often grant relief in cases of mistake, when a meritorious case is established by the pleadings and proofs, but the remedy is regulated by well-established rules of law, and undoubtedly Congress had the same rules in view when it extended this remedy to similar cases, under the patent-law which they enacted.
It is conceded that the Supreme Court has decided in several eases that the granting of a re-issued patent closes all inquiry into the the existence of inadvertency, accident, or mistake. A presumption then arises, that the proofs have been regularly made, and that they were satisfactory. “ No other tribunal is at liberty to re-examine or controvert the sufficiency of such proofs, if laid before him, when the law has made such officer the proper judge of their sufficiency and competency? Railway vs. Stimpson, 14 Pet., 459; Seymour vs. Osborne, 11 Wall., 542.
In the case at bar no such presumption arises, for the patent has not been issued, and the proofs are before us to be examined and weighed, and we are called upon, as preliminary to the granting of the patent, to judge of the sufficiency and competency of the proofs to sustain the application, in conformity to the essential requisites of the statute. *380 The decisions referred to can have no application to an appeal of this kind.
In this case, Stafford during Ms life-time never pretended to any one that his patent was inoperative, or that the specifications were defective in any respect, or that he had omitted or added anything accidentally or by mistake. On the contrary, he always claimed for it the highest merit and practical utility. The evidence in the case of Sayles vs. Hopgood, used by consent on this application, establishes beyond any doubt that it was a valuable invention, and, as one of the witnesses, expresses it, a strong, durable, and efficient farm-implement. It appears that more than 15,000 of the machines had been manufactured under the patent up to the time of his death, in 1866, and sold to the public. Another circumstance of much significance is not to be overlooked in this connection, and it is, that, after the original patent had been obtained, Stafford made further improvements upon the same cultivator, and for one of these he procured a distinct and independent patent. About three weeks before he died he gave his brother a description of a model for another improvement, which was patented after his death; and during all the time he was employed in devising models of new improvements upon his invention there is not a particle of evidence tending to show that he claimed there was anything wanting in the specification which he had filed in the Patent-Office when he obtained the original patent in 1361. It seems quite clear, upon this state of the case, that Stafford never intended to patent more than he had carefully and definitely described in Ms original application, and that everything else which he might have invented up to that period was aban, doned to the public. This intention is clearly indicated by his act and is as fully proved as it is possible to prove the purposes of one now dead.
It is noticeable that the application for the re-issue states none of the causes mentioned in the statute for which a new patent may be issued, and a careful examination of the proof discloses the fact that not a particle of evidence has been taken to sustain these prerequisites of the law. No presumption can prevail here that the proofs have been made, as would be the case if a patent had issued, and the only rational belief *381 that can arise upon the case as it now stands is, that Stafford abandoned what he did not include in his specifications.
We are aware that the Commissioner has presumed abandonment from what he deems proof of public use of the invention for several years previous to the issuing of the original patent. While we may not be satisfied that a public use is shown of such a character as to establish abandonment, yet the testimony on this subject, taken in connection with the facts I have already mentioned, adds considerable force to the presumption that Stafford never intended to patent what is now claimed. He made -his first machine in 1842, and it comprehended in a rude form all the elements of the combination for which in 1861 he obtained a patent. It was a two-wheeled straddle-row cultivator, with plows on each side, so as to cultivate a whole row at a time, with a seat for the driver, drawn by two mules, and did as good work as a single plow. To explain the delay which took place from his first machine in 1842 until heobtained his patent 18 years afterward, in 1861, the appellants claim to have proved by the testimony of several witnesses that during all that time Stafford was in poor health, and was greatly embarrassed in his circumstances $ that he was employed from time to time in improving his invention, and constantly declared his intention to obtain a patent as soon as he could procure the means. Whether this was the real cause of delay or not, such a protracted period of reflection and experiment afforded him extraordinary opportunities to ascertain and describe his claim with precision and accuracy. There is no proof that he was not entirely satisfied with wbat he did. The application for the re-issue is not made until 1871, a period of nearly five years after his death, and thirty years after he had reduced his invention to a practical form. In the mean time at least one hundred distinct patents have been issued for cultivators, and the numerous manufacturers in the West and Northwest are respectively manufacturing on patents of their own. The art has probably received many valuable additions from the efforts of so many persons; but if the claim of these appellants be allowed, they would have a monopoly of every form of cultivator with wheels, axles, plows, and a seat for the driver. It would, indeed, be a patent for a cultivator gen *382 erally. Such a claim should not be assented to unless it can be shown with reasonable certainty that if, patentable at all, it has never been deserted and abandoned by the inventor.
We are of opinion that the decision of the Commissioner should be affirmed.
Some discussion occurred during the argument concerning the jurisdiction of this court on án appeal from a decision of the Commissioner of Patents. The 48th section of the act provides for the appeal, and the next section directs that the appellant shall file in the Patent-Office his reasons of appeal in writing; and the 50th section enacts that the court shall revise the decision appealed from, and that such revision shall be confined to the points set forth in the reasons of appeal. A majority of the court are of opinion that by a true interpretation of these sections we can only examine into the reasons of appeal, and the record and proceedings so far as they apply thereto, for the purpose of ascertaining whether the Commissioner has made an erroneous decision ; and that we cannot revise the decision on any other ground than that upon which the application was rejected. In the case now under consideration the re-issue was denied for the reason that the inventor had abandoned to public use the subject-matter of his own two claims, and the appellants assign their reasons for appealing to be that the Commissioner erred in refusing the claims on the ground of abandonment, The issue is thus clearly defined in the mode designated by the law, and we are forbidden to set the decision aside on any other ground. Nor can we go into the record at large for the general purpose of seeing whether the decision is right on some other ground not passed upon by the Commissioner, nor stated in the reasons of appeal-It has been suggested that a case may occur in which the true grounds of error are not set forth in the reasons of appeal, and yet the decision be sustainable on some other ground. It is, however, a sufficient answer to this view that it is not our duty to put a forced construction on statutes to remedy supposed evils. Besides, if the party wishes to test his general right to a patent, he can do so under the 52d section, which declares that he may have a bill in a court of equity if he has been refused a patent by the Commissioner.
*383 We have deemed it proper to dispose of this matter in the present case for the pnrpose of settling the practice on a disputed point in this class of cases.
Mr. Justice Olin concurred in the judgment to affirm the decision of the Commissioner, but dissented from the opinion that the court could only consider the reasons of appeal, and expressed himself on that point as follows:
I will proceed now to consider the appellate power of this court when sitting in review of a decision made by the Commissioner of Patents.
Section 48 enacts that if such party, (any party,) except a party to an interference, is dissatisfied with the decision of the Commissioner, he may appeal to the supreme court of the District of Columbia, sitting in banc. Section 49 further enacts, that when an appeal is taken to the supreme court of the District of Columbia the appellant gives notice thereof to the Commissioner, and files in the Patent-Office, within such time as the Commissioner shall appoint, his reasons of appeal, specifically set forth in writing. Section 50, it is further enacted, “that it shall be the duty of said court, on petition, to hear and determine such appeal, and to revise the decision appealed from, in a summary way, on the evidence produced before the Commissioner, at such early and convenient time as the court may appoint, notifying the Commissioner of the time and place of hearing; and the revision shall be confined to the points set forth in the reasons of appeal. And after hearing the case, the court shall return to the Commissioner a certificate of its proceedings and decisions, which shall be entered of record in the Patent-Office, and govern the further proceedings in the case.’* These are the only provisions, so far as I can discover, that regulate the appellate powers of this court upon the hearing of appeals from the decision of the Commissioner of Patents, except what is contained in section 51, which provides that on receiving notice of the time and place of hearing such appeal the Commissioner shall notify all parties who appear to be interested therein, in such manner as the court may prescribe. The party appealing shall lay before the court certified copies of all the original papers and evidence in the case.
*384 Tbe provisions of the statute I have now quoted have been the subject of much debate and discussion among the members of this court, and, so far as I can learn, I compose a very small minority in my views as to the true meaning and proper construction of these provisions.
These provisions seem to me to combine the practical operation of a bill of exceptions and that of a writ of error.
First, the appellant has his bill of exceptions, in this way: He is required to state in writing the grounds upon which he appeals to this court from the decision of the Commissioner. If the court, looking at the whole record, can see that the grounds or reasons of appeal are not good or tenable, the decision of the Commissioner must be affirmed, even though the court looking through the record should discover that, in its opinion, the Commissioner decided wrong, yet as the party appealing to this court had not assigned the true cause for which the judgment of the Commissioner should be reversed, his decision should be affirmed. This is the precise office of a bill of exceptions, in which the party excepting can only obtain a reversal of a decision or judgment by pointing out the precise question upon which the court, or, as in this case, the Commissioner, erred. If the appellant fails to do that, the judgment must be affirmed. But on the other hand the Commissioner, who represents the public, stands in the relation of a party to a writ of error, upon which the court, having the whole record before it, will give such judgment as, upon the whole consideration of the case, ought to be given. In other words, that the only limitation of the powers of this court on appeals is a limitation of its powers in reference to reversing the decisions of the Commissioner for any other ground than that set forth in the reasons of appeal assigned by the appellant; but that, as to every other question arising from the record, this court is at full liberty to look through it and judge whether the decision made is right. If this be not so, what is the object or pro. priety of sending to us all the proceedings in the case as fully as they were before the Commissioner ?