## LOUIS LLOYD ET AL.

### v.

## J. FILLMORE THOMPSON.

1. JUDGMENT AGAINST EVIDENCE.—Questions of fact mainly are involved in this case. The court reviews the testimony, and is of opinion that the judgment is unsupported by the evidence, and it is therefore reversed.

2. EVIDENCE—CROSS-EXAMINATION. — A party has no right to cross-examine a witness except as to facts and circumstances connected with the matters stated in his direct examination. If he wishes to examine him as to other matters, he must do so by making the witness his own, by calling him as such in the subsequent progress of the case.

APPEAL from the Circuit Court of Cook county; the Hon. HENRY BOOTH, Judge, presiding. Opinion filed January 7, 1880.

Mr. F. J. SMITH, for appellants; that the court erred in permitting the cross-examination to extend to matters not stated in the direct examination, cited Bell v. Prewitt, 62 Ill. 361; Stafford v. Fargo, 35 Ill. 481.

Messrs. BENTLEY & QUIGG, for appellee; that money paid under a mistake of fact may be recovered back, and may be the subject of set-off, cited Rev. Stat. Ch. 110, § 30; Delinquent Lands of Ford Co. v. Collector of Ford Co. 10 Chicago Legal News, 193; Kelly v. Solair, 9 Mees. & Wels. 54; 2 Smith's Lead. Cas. 400; Harmon v. Risk, 2 Bradwell, 511.

WILSON, J.   Prior to and subsequent to the great fire of October, 1871, in Chicago, Lloyd & Co. were engaged in the business of procuring, for business men and others, advertisements to be published in newspapers in the city of Chicago and elsewhere.   Appellee, Thompson, was a dentist, and in the month of October, 1871, an arrangement was entered into between him and Lloyd & Co., by which the latter were to have appellee's card published in the *Staats Zeitung* and the *Skandinaven* newspapers, published in Chicago.   The advertisements were accordingly published from October, 1871, to January 23, 1877, in the *Staats Zeitung*, with the exception of a few weeks in 1874, and in the *Skandinaven* from October 23, 1871, to December, 1876.   During the time the advertisements were running, regular quarterly bills for the same were rendered by Lloyd & Co. to Thompson, which were paid by him from time to time, without objection.   In June, 1877, a bill for the balance then claimed to be due by Lloyd & Co. was presented to Thompson, who paid a small sum thereon, and thereafter declined to make further payment; whereupon Lloyd & Co. commenced this suit, to recover the balance of their account.

The defendant pleaded the general issue and a set-off.   A jury was waived, and the case submitted to the court for trial, who found for the defendant $267.25.   The plaintiffs bring the case here by appeal.

It appears from the evidence that Lloyd & Co. were advertising brokers, doing business in Chicago, and that they were in the habit of engaging space by the year in newspapers, the publishers making a discount to them from the ordinary rates, in consideration of Lloyd & Co.'s agreement to pay for the space whether they should be able to fill it or not.   They also

procured. the insertion of advertisements for their customers, the price of which was charged to Lloyd & Co., and not to the advertiser, Lloyd & Co. in like manner receiving a discount from the usual rates. They were thus enabled to furnish their customers with advertising at rates less, or not exceeding, the price at which individual advertisers could obtain the same, thereby saving them the trouble and inconvenience of procuring and looking after advertisements themselves. The discount which the brokers obtained was the only remuneration they received for their services, no charge being made against their patrons.

There was some conflict in the testimony as to the terms of the agreement between Lloyd & Co. and Thompson, for publishing the advertisement in question. Lloyd swears that prior to the great fire of 1871, his firm had published Thompson's card in the *Staats Zeitung* and *Skandinaven*, at first from week to week, at three dollars per week; that finally Thompson agreed with them to run it in those two papers until he should direct them to stop it; and that this arrangment existed at the time of the fire. That after the fire, and about October 20, 1871, Thompson told Lloyd he had been having his card published in the *Staats Zeitung* and *Skandinaven*, and he complained that they were charging him too much and more than Lloyd & Co. had previously charged him; and he said if Lloyd & Co. could continue his advertisements in those two papers at the same rate they had been placing it before the fire, they might do so; that there was no specified time they were to continue it; that Lloyd & Co. commenced advertising immediately after this interview, and published appellee's card in the *Skandinaven* until December 5, 1876, and in the *Staats Zeitung* until January 27, 1877; that from October 20, 1871, until October, 1874, a period of about three years, Lloyd & Co. rendered bills quarterly for $39.00, being at the rate of three dollars per week, which Thompson paid without objection; that some time subsequent to October, 1874, Thompson asked for a better rate, on the ground that there had been a falling off in the price of labor and printing material, and it was finally agreed between them that if Lloyd & Co. would allow him ten

per cent. better rates he would continue. The concession was made, the time of the reduced rate to begin as of October 20, 1874, and thereafter the bills were rendered at $2.70 per week, amounting to $35.10 quarterly, and were paid by Thompson, with more or less punctuality, until July, 1876, when he refused to pay, as already stated. Lloyd testifies that he made out the bill quarterly instead of weekly, as a matter of convenience in booking, and to save time in making collections.

Thompson swears that no price was agreed upon, except that the advertisements were to be upon the cheapest and lowest terms; that he authorized Lloyd & Co. to insert the card upon their assurance that it could be inserted by the year, with the privilege of discontinuing at the end of any quarter, and that it was to be at the cheapest and lowest rates; and the ground upon which he bases his defense and his right to recover against the plaintiffs under his plea of set-off is, that the plaintiffs had not furnished him with advertising at the lowest rates, but on the contrary, had charged him an unjust and extortionate price, which he, in ignorance of the actual cost of the advertising, paid.

While the discrepancy in the testimony as to the terms of the agreement may not be very important, we think the testimony of Lloyd is strongly corroborated by other evidence appearing in the record, while that of Thompson stands alone, and is unsupported. The agreement, as stated by Lloyd, is one which the parties would be very likely to make under the circumstances. Lloyd & Co. had published Thompson's card prior to the fire at three dollars a week from week to week, the advertisement to be stopped whenever Thompson should direct. After the fire Thompson himself tried the experiment of getting the advertisement inserted, and found he was paying more than Lloyd & Co. had previously charged him. It was natural, therefore, that he should again apply to Lloyd & Co., and authorize them to continue his advertising, provided it could be done at the old rate of three dollars a week, with the privilege on his part of discontinuing at any time. They commenced advertising, the bills were made out at the rate of three dollars a week, were sent to Thompson, and were paid by him without

objection, for several years. It seems to us incredible that he should have paid these bills during all that time, if it was not in accordance with his understanding of the agreement. Continuing to pay them for so long a period without objection, he must be deemed to have acquiesced in their correctness, and cannot now be heard to say that they were in violation of the agreement. The testimony of O'Connor, the bookkeeper of Lloyd & Co., who collected the bills, further corroborates Lloyd's version of the agreement. He swears that in 1874, Thompson told him he thought there ought to be a deduction of ten per cent. from the price of the advertising, and that if Lloyd & Co. would not reduce it, to discontinue the advertisements; and that upon O'Connor reporting to the firm what Thompson had said, the deduction on the bills of ten per cent. was made. O'Connor also testifies that Thompson in that conversation said nothing about discontinuing the card at the end of a quarter, but that the understanding was to stop it at once whenever Thompson should so direct. We think, therefore, that Lloyd's version of the agreement is supported by a clear preponderance of the evidence, and should be accepted as true rather than that of Thompson.

But it is claimed by appellee that Thompson was acting all along, under the belief that Lloyd & Co. were procuring his advertising at the lowest and cheapest rate. In respect to this claim, it is to be observed, first, that it assumes Thompson's version of the agreement to be the true one; an assumption which, as we have already seen, is unauthorized by the evidence; and secondly, conceding the terms of the agreement to be as stated by Thompson, it is difficult to see how such a contract, viewed in the light of the evidence disclosed in this record, could be of any practical avail to appellee. The term "lowest and cheapest price," it must be admitted, is rather vague and indeterminate. By what standard is the lowest price to be measured? Publishing the card of a dentist in a newspaper could hardly be said to have a market value, like wheat, or corn, or stocks. It would be a strained construction, and certainly a very inequitable one, to hold that the words "lowest and cheapest price" implied that it was the lowest

price at which the newspapers would do the work for Lloyd & Co., for the effect of such a construction would be to deprive Lloyd & Co. of any compensation for their services. Nor would appellee claim that it was intended to be the lowest price at which an individual could procure an insertion of an advertisement, for he had learned from his own experience that the cost to an individual advertiser was greater than he had paid Lloyd & Co. before the fire. There is no evidence showing that there was any tariff of prices among advertising brokers; and we are unable to see from the nature of the case, how it would be possible to fix upon any specific standard by which it could be determined what was a high or low price. Nor is there any evidence to show that Thompson could have procured the advertising at a less price than three dollars a week. The *onus* was on him in that regard.

That Lloyd & Co. represented to Thompson, as they doubtless did to the public in general, that they furnished advertising at the lowest rates, is entirely probable. But representations of this sort are like the commendations of a tradesman as to the value or price of his goods; they are neither guaranties, nor do they form any part of a contract.

We think the evidence shows that the parties entered into an ordinary business contract, by which Lloyd & Co. agreed to procure the insertion of Thompson's card in the *Staats Zeitung* and *Skandinaven* at an agreed price, to be continued until ordered stopped by the latter. Thompson voluntarily agreed to pay the specified price, and for years paid it without objection. This was a constant recognition by him of his liability to pay according to the terms of the contract, and it is immaterial what Lloyd & Co. paid the newspapers. They were not the agents of the newspapers, as is abundantly shown by the evidence. The testimony on this point is full and explicit. Not only does Lloyd so testify, but Pietsch, the Secretary and Treasurer of the *Staats Zeitung* swears "they are not our agents; they had a general business, and worked for themselves; we take their business provided they will pay for it." Anderson, publisher of the *Skandinaven*, testifies: "They are not my agents; they simply bring in advertise-

ments and make an arrangement to publish them." Lloyd & Co. were acting in their own behalf as advertising brokers, and whether the agreement entered into between themselves and Thompson was more or less profitable is not material.

We are further of the opinion that the court erred in its rulings on the cross-examination of Pietsch. Appellants' counsel called him to prove the simple fact that the card was published, and upon whose order. Upon the cross-examination the defendant was permitted, against the objection of the plaintiffs, to prove how much the plaintiffs paid the newspaper for the advertisement, and why the paper allowed plaintiffs twenty per cent. discount on the same. The rule is well settled in this State, as well as in the Supreme Court of the United States, that a party has no right to cross-examine a witness except as to facts and circumstances connected with the matters stated in his direct examination, and that if he wishes to examine him as to other matters, he must do so by making the witness his own, by calling him as such in the subsequent progress of the cause. 1 Green. Ev. § 445; The Phila. & Trenton R'y Co. v. Stimpson, 14 Pet. 448; Stafford v. Fargo, 35 Ill. 481. The line of cross-examination allowed by the court was in violation of this rule and was error.

The judgment of the court below must be reversed and the case remanded.

Reversed and remanded.