# Cases

# FIRST DEPARTMENT,

# GENERAL TERM,

### November, 1879.

---

## THE PEOPLE OF THE STATE OF NEW YORK, RESPOND-ENT, *v.* HENRY W. GENET.

*Obtaining money by false pretences — what facts justify a conviction thereof — leading questions on cross-examination — cross-examination of accused.*

The defendant in error, Genet, was indicted and convicted of obtaining money from the city of New York on false pretences. It appeared that in 1870 Genet, being counsel to the commissioners to erect a district court house in New York, one Davidson applied to him for the contract for the iron work, and was by him referred to one of the commissioners, who said he would see Genet about it. In June, 1871, Davidson saw Genet, receiving from him a memorandum of the work, and made an estimate under his directions. Davidson having refused to deliver the materials, except upon payment of the price, made out a bill, under Genet's direction, for the full amount, showing delivery of all the iron work during the months of January, February, March, April, May and June, 1871, as per agreement with commissioners, when in fact none of it had been delivered. Genet having procured the certificate of the commissioners to the bill, sent it to the comptroller's office, where it was audited, and a warrant prepared and signed by the comptroller and mayor. The auditing and signing of the warrant were based upon the bill certified by the commissioners. Thereafter Genet drew the money upon the warrant as the attorney of Davidson. *Held,* that these facts warranted a conviction of the defendant of obtaining money on false pretences.

On cross-examination leading questions tending to elicit new matter are not allowed as a matter of right.

As to the proper limits of a cross-examination of the accused offering himself as a witness in his own behalf.

CERTIORARI to the Court of Oyer and Terminer to review the conviction of the appellant, of the offence of obtaining money by false pretences.

This case came before the General Term upon the return of the Court of Oyer and Terminer, issued upon the petition, pursuant to the statute, of Benjamin K. Phelps, the district attorney of the county of New York ; the defendant having been tried and convicted upon an indictment found in the said county, upon which judgment had not been entered ; the Hon. CHARLES DANIELS, one of the justices of the Supreme Court, before whom the trial was had, having certified that he had examined the bill of exceptions, and that, in his opinion, "there is probable cause for the same, and the same presents questions creating so much doubt as to render it expedient to take the judgment of the Supreme Court thereon."

*B. K. Phelps,* for the people.

*W. A. Beach,* for the defendant Genet.

BRADY, J.:

The indictment in this case charges that the defendant, on the 14th of July, 1871, with intent feloniously to cheat and defraud the mayor, aldermen and commonalty of the city of New York, a corporation duly existing under the laws of the State of New York, feloniously, unlawfully and knowingly, falsely did pretend and represent to A. Oakey Hall, then being mayor of the city of New York, and, as such, being then and there an officer of said corporation, authorized to countersign warrants for the payment of moneys out of the treasury of said corporation ; that the said corporation was justly indebted to one J. McB. Davidson in the sum of $4,802 for materials furnished for the ninth district court house by the said Davidson, and that a certain bill, purporting to set forth the items of the said materials, was then and there ex-

hibited to the said A. Oakey Hall, and which bill contains the items in substance as follows, that is to say :

| "1871. | | |
|---|---|---|
| January, February...................................... To iron work............ |  ...................... |
| March, April, May.................................. Window frames....... |  ...................... |
| June...................................................... Iron timbers, etc...... |  ...................... |
| On contract as per agreement with commissioners.......................................... | ............................. | $4,710 00 |
| Cartage.................................................. | ............................. | 92 00 |
| | | $4,802 00 " |

And, further, that the said Davidson had supplied, for the use of the said corporation, iron work, window frames, iron timbers and other things, to the amount of $4,710, and that there was due for cartage, on the said materials, the sum of $92 ; and, further, that the said materials, in the said bill mentioned, had been received by the said corporation from said Davidson and applied to the proper uses of said corporation. It also contained the necessary allegation, negativing the representations so made and alleged to be false.

It appeared, on the trial, that Mr. Tweed, Mr. McQuade and Mr. Porter were the commissioners having charge of the construction of the ninth district court house, and that Mr. Davidson being a dealer in iron, applied to Mr. Genet, who was the counsel to the commissioners, for the contract to furnish iron, and was referred by him to Commissioner Tweed ; that he saw Mr. Tweed upon the subject, who told him that he would speak to the defendant about it, who, he thought, could procure the contract for him. This seems to have been in the winter of 1870 and 1871, at Albany. In June following, Davidson and the defendant had a further interview, during which the defendant furnished Davidson with a memorandum, prepared by the architect or superintendent of the work, from which Davidson made an estimate of the materials, and then made out the bill for the same set out in the indictment, under the direction of the defendant. It appeared, also, that Davidson agreed to furnish the materials, but declared that he would not deliver them unless upon payment of the price thereof, to which the defendant re-

plied that he would get the money. It further appears that the defendant, having received the bill thus made out, delivered it to Mr. Corson, who was the secretary of the commissioners, or to Mr. Tweed, informing him of the requirement made by Davidson. The bill, made out as stated, was duly certified by the commissioners and sent to the comptroller's office, where it was audited, and a warrant was prepared for its amount, which was signed by the comptroller and subsequently countersigned by the mayor, to whom it was sent for that purpose. The audit was predicated of the bill thus certified by the commissioners, and which, being thus certified and audited, became what is called a voucher, upon which the comptroller and the mayor both acted officially in signing and countersigning the warrant. It appeared, from the testimony of the mayor, that his reliance was substantially upon these various forms of procedure, the primary one of which was the bill made out as shown, under the direction of the defendant. That paper formed the basis of the action of the commissioners, of the auditor, of the comptroller and of the mayor. It is true that the mayor is not certain that there was a voucher ; but the inference from his testimony, indeed, the finding upon it, must be that this voucher was attached, in some way, to the warrant when it was countersigned. But whether it was or not, was a question for the jury, which they have decided in favor of the People. It may seem strange, that upon such an array of facts, there can be any doubt that the defendant was the originator of a false representation — a false pretence — if the iron was not delivered at the time the bill was made out and presented to the commissioners, and by them certified in the manner stated. The bill was false in every particular ; no iron had been delivered, no cartage had been paid ; and indeed, except what might be supposed to have been created by an informal interview with Mr. Tweed, there was no contract for iron made between Mr. Davidson and the commissioners, or anybody else.

It is quite evident that the commissioners, in certifying such a bill, representing as it did the delivery of material, the non-receipt of which it was their duty to have known, were guilty of negligence, by which what was a fiction, became, in fact, a reality. It became a reality because, when their certificate was given, it

was in condition to be sent forward to be impressed with the other acts in reference to it, necessary to make it effective. If the defendant's connections with that paper had ceased, however, after its preparation and presentation, it might well be that he could not have been convicted of the offence of which he was accused. But it did not, because the evidence showed that when the warrant based upon it had gone through all the forms required, in the fiscal department, and had received all the authentication necessary to insure its payment, it was received by him from the comptroller, indorsed by him as the attorney of Davidson, to whose order it was drawn, and, upon presentation by him to the bank upon which it was drawn, duly paid to him. It thus appears that the defendant, in effect, prepared the bill containing the false pretence ; presented it to the commissioners (of whom he was the counsel, and who might, even as prudent men, have relied upon his acts), and received the warrant based upon it and collected its amount.

The response of the defendant to the accusation thus made by the People is, substantially, that he, by this method, undertook to procure the money for the purchase from Mr. Davidson, in order to complete the contract, for the reason that Davidson had positively declined to deliver the materials other than upon payment for them, and that he had no intention, at that time, or at any subsequent time, to defraud, or in any way wrong, the city of New York, but obtained the money for Mr. Davidson and sought him to pay it over to him, and so offered when he found him, and that Davidson refusing to receive it, he paid it to Mr. Scallon, who used it in paying for labor done upon the court-house. He has had the benefit of this exposition, but the jury, upon consideration of all the facts and circumstances of the case, have determined, by their verdict, that this defence was not satisfactorily established, and could not, therefore, relieve him from the consequences of the offence of which he stood charged.

The learned counsel for the defence relies, with much confidence, in the consideration of this appeal, upon the fact that the defendant made no representation personally to the mayor or to the comptroller or to the auditor. It must be admitted that he made no representation personally to the mayor, inasmuch as

no interview between them has been shown. But he cannot escape from the charge that he did indirectly make to the mayor a false representation — a false pretence — by the preparation and use of the bill which, through his direct instrumentality, became a voucher, and upon which thus created by him, the auditor, the comptroller and the mayor acted. Indeed, it may be said that this is a liberal statement of the effect of that paper, so far as the defendant is concerned, because it might, with great propriety, be said that the bill prepared by him, and which he knew must form the basis of such proceedings as would take place in the fiscal department of the city, was a direct statement on his part that its contents were true to each person whose duty rendered it necessary for him to examine and act upon it. It was this proceeding, this pretence, which set the claim in motion and formed, as already suggested, the very foundation of all that was subsequently done to consummate the wrong design. His actual presence was not necessary to accomplish the offence. (*People* v. *Adams*, 3 Denio, 190; *Adams* v. *People*, 1 N. Y. Rep., 173.) The statute under which the defendant was indicted declares that every person who, with intent to cheat or defraud another shall designedly, by color of any false token or writing, or by any false pretence, etc., obtain the signature of any person to any written instrument, or obtain from any person any money, personal property or valuable thing, upon conviction, shall be punished, etc. And there seems to be little doubt that the bill in question was under this statute a false writing, there can be none that it was a false pretence ; and, being a false pretence, whether it was designed to cheat and defraud was a question to be determined by the consideration of all the facts and circumstances developed on the trial. It was sufficient, therefore, the intent to cheat and defraud existing, to accomplish the commission of the crime, that the bill influenced the mayor to give his signature to the warrant, because it was the exclusive, as it was the necessary, foundation upon which all the ceremonies to effectuate it rested. Without the bill there would have been no certificate, no audit, no warrant, and, therefore, no act of the mayor. The defendant was dealing with the funds of a corporation to be reached by certain forms designed for the security of its members, and knew the mode by which these forms could be

applied. The bill was, in effect, equivalent to a verbal representation therefore. The cases illustrative of the doctrine of false pretence demonstrate the propriety of the verdict rendered. For example, a workman employed by a clothier, whose duty it was to keep an account of the number of shearmen employed and the amount of their wages, and which he was to deliver weekly, in writing, to a clerk who paid him the amount, delivered a false account, charging for more work than was done, and for more men than were employed, and it was held that the money obtained in excess was obtained by false pretence, because without the false pretence he would not have obtained the credit, and the judges agreed that if the false pretence *created the credit*, the case was within the statute. (*Rex* v. *Mitchell*, 2 East, P. C., 830.) It was the bill framed under the direction of the defendant in this case, and its presentation by him to the commissioners for their certification which *created the credit* upon which the money was obtained. (See *Reg.* v. *Leonard*, 2 Car. & K., 514.)

In the case of *Rex* v. *Barnard* (7 Car. & P., 784), the indictment charged that the prisoner falsely pretended that he was an under graduate of the university of Oxford and a member of Magdalen college, by means of which he obtained a pair of boot straps from one Samuel Vincent. It appeared that Vincent was the boot maker, and the prisoner went to his store wearing a commoner's cap and gown and ordered boots which were not supplied and straps which were. He stated that he belonged to Magdalen college, and this appears to have been the only statement made by him. It was proved that he did not belong to Magdalen college, and that there were no commoners at that institution. BOLLAND, B., said: "If nothing had passed in words I should have laid down that the fact of the prisoner's appearing in the cap and gown would have been pregnant evidence from which a jury should infer that he pretended he was a member of the university, and, if so, would have been a sufficient false pretence to satisfy the statute."

It was a strong circumstance, in this case, affecting the intention of the defendant, in the preparation of the bill, that he stated in it the months noted on the margin, because that added representations in detail to the general representation of the amount

due, and was evidence that he was familiar with the ceremonies to be observed in the audit and payment of bills against the city. The representation of an occurrence that has not happened is a false pretence, and it is not necessary that the false pretence be the sole or only inducement to the credit given or the delivery of the goods made. It is enough that it has so material an effect in procuring the credit, or inducing a delivery of the property, that, without its influence upon the mind of the party defrauded, he would not have given the credit or parted from the property. If it had a controlling influence it is sufficient to warrant a conviction. And it is not necessary that the pretence or representation should be such that common prudence or ordinary care could have guarded against it. (*People* v. *Haynes*, 11 Wend., 557; *People* v. *Herrick*, 13 id., 87; *People* v. *Sully*, 5 Park. C. R., 142; 2 Bishop on Criminal Law, §§ 448, 464, and cases cited.) Under the circumstances disclosed, therefore, it seems to have been properly alleged in the indictment that fraudulent representations for a fraudulent purpose were made to the mayor, and the defendant cannot avail himself upon the evidence of any objections to the form of the indictment in that respect. It is our judgment, consequently, that the proof furnished by the prosecution under the indictment demanded, in the administration of justice, a submission of the question of the defendant's guilt or innocence to the jury, and that it was sufficient to have warranted his conviction if the jury believed that what he did was done with a fraudulent intent.

Having arrived at this conclusion it remains to be determined whether any of the other exceptions taken on behalf of the defendant are such that a new trial should be granted. It is deemed only necessary to say, in regard to the exceptions to the rulings of the presiding justice as to some of the jurors who were sworn, that they are answered by the adjudication made in the case of *Thomas* v. *The People* (67 N. Y. R., 218). These jurors, although they had formed opinions, stated that they believed they could render an impartial verdict upon the evidence unbiased by such opinion, and this avowal rendered them indifferent under the statute of 1872. The recent case, *Greenleaf* v. *The People* (MSS. op.), does not affect the question, or change the rule established by the case (*supra*). The juror, in the last case, had formed an opinion

upon reading *the evidence given on a trial,* and this was held to present a different question, on account of the more impressive source of information, to that considered in the case of Thomas. The principle is the same, it would seem, but the distinction is made, and the doctrine must be observed. The exceptions to the evidence will be considered in the order in which they were presented on the argument. The first exception relates to a question as to the intent of Davidson in preparing the bill. The question was as follows :

" Q. Was this bill prepared and furnished by you to Mr. Genet for the purpose, in your own mind, to enable him to raise the money to pay for the materials which you agreed to furnish, mentioned in the bill ? "

It was excluded by the court on objection, as follows :

" The Court—I don't think that is proper. I think the witness must go on and state what was said and done between himself and defendant about the bill, and the purpose for which it was made, and his intent in making it."

The witness was then asked the following question and gave the answer that succeeds it :

" Q. Will you please state what, if anything, was said in regard to the preparation of this bill, with reference to obtaining the money to make payment to you for these materials to be furnished ? "

" A. I made out the bill and told him to collect the money, as I had so much trouble with the city and county of New York in collecting my accounts, that the money must come at the time the goods were delivered."

It will be perceived that the learned justice did not prevent the examination of the witness as to his intent in making the bill, and he was examined to some extent on that subject, as the succeeding questions and answers show :

" Q. Do you recollect that in the interview with Mr. Genet you informed him that, in the meantime, while he was taking the bill and collecting the money, you would send orders to your factory in Albany for the preparation of the materials ? "

" A. I told him these goods could be delivered immediately upon the receipt of this money."

"Q. Does it occur to your recollection, now, any remarks of yours made, of the substance which I stated in my former question, that you would send to your factory, in Albany, so that the materials could be prepared to be in readiness when he should obtain the money?"

"A. I spoke about the material being in readiness when the money was obtained."

"Q. You don't recollect alluding to your factory in Albany?"

"A. Oh, no; that, I suppose, he understood."

We think the exception thus considered was not well taken, therefore.

The next exception is to a leading question asked the witness, Davidson, who was on cross-examination at the time by the defendant's counsel. The facts sought to be elicited were new, and leading to the development of the defendant's defence — new matter, as it is designated — and the objection was taken that leading questions were not a matter of right as to such new matter. The court so held. Leading questions are admitted on cross-examination, in which much larger powers are given to counsel than on the original examination. But, upon cross-examination, a leading question, in respect to new matter, is objectionable, although the subject is within the discretion of the presiding judge. (*Harrison* v. *Rowan*, 3 Wash. C. C. Rep., 580; *Ellmaker* v. *Buckley*, 16 Serg. & Rawle, 77.) In the latter case, GIBSON, Ch. J., dissented from the doctrine broached in Phillips' evidence, that the cross-examination continues through all stages of the cause, and secures the right to ask leading questions in regard to new matter. The Supreme Court of the United States has declared that the right does not exist. (*The Philadelphia and Trenton R. R.* v. *Stimpson*, 14 Pet., 448.) A party cannot cross-examine the plaintiff's witnesses as to new matter, in order to introduce his defence untrammeled by the rules of the direct examination. (*Castor* v. *Brovington*, 2 Watts & Serg., 505; *Floyd* v. *Bovard*, 6 id., 75.) See, also, 1 Greenl. Ev., § 445, in which it is stated that this rule is considered to be well established. The learned authors of Cowen & Hill's notes, on Phillips' Evidence (see vol. 2, p. 730, n. 511) defend Mr. Phillips from the criticism of GIBSON, Ch. J., and concede that the text of Phillips

does not assert the right to ask leading questions on cross-examination to sustain new matter of defence, and the case of *Harrison* v. *Rowan*, holding that there is no such privilege, is cited in the note with approbation. In *Jackson* v. *Son* (2 Caines, 178), it was held that the cross-examination of a witness in such a manner as to call forth new matter, made him the witness of the party cross-examining as to it, and this doctrine was approved in *The People* v. *Moore* (15 Wend., 423). It was said, prior to the last case cited, "there is an essential difference between a direct examination and a cross-examination; and the court ought not, except in peculiar cases, to permit the former to assume the character of the latter: (Per MARCY, J., in the *People* v. *Mather*, 4 Wend., 248.) But, in conclusion, it must be said, that the propriety of putting leading questions is a matter of discretion. This is, indeed, an elementary principle of evidence."

The witness, it must be observed, was not prevented by the ruling complained of from stating any facts, but the mode of obtaining such facts was designated. There is nothing, therefore, in the exception considered.

The defendant also complains that a witness named Scallon was allowed, on cross-examination, to make many statements in regard to the transactions relating to the county court house which were prejudicial to his defence, but the testimony was elicited to affect the credibility of the witness, and so declared. It was also designed to demonstrate that the money given him by the defendant, and which the latter said was the proceeds of the warrant, was in truth applied to the payments due or to become due for materials supplied or work done towards the completion of a house which the defendant was building. This sifting process was, of course, subject entirely to such limit as the presiding justice thought proper to place upon it. If the cross-examination developed such relations of the witness to the defendant, or to the work which he was superintending, as to make him unworthy of credit, the People were entitled to the benefit of that result, or if it proved that the money which he received, as stated, had been used towards the erection of the defendant's house, the People were equally entitled to that result. They had the right, not only when this witness was on the stand,

but when the defendant himself became a witness on his own behalf, to pursue this line of inquiry, and to such extent as the presiding justice should permit in the exercise of a fair discretion.

The witness Scallon, on his re-direct examination, stated distinctly and emphatically, however, that none of the money received by him, as stated, was used in the erection of the defendant's house. The defendant himself had the opportunity and intelligence to state his case and to explain any untoward circumstance which Scallon's cross-examination revealed. The counsel for the People seem to have extended their inquiries to great length and over a large field, but the defence was such as apparently warranted such a procedure. As long as the rule prevails that the limit of cross-examination is a matter of discretion resting with the presiding justice, to be exercised according to the facts and circumstances surrounding the case, the character of the issues, nature of the testimony, the demeanor and manner of the witness, and the various incidents of the trial, a court of review will not condemn the limit observed, unless it clearly appears that the discretion was abused to the prejudice of the party affected by it. We are not able to declare that these elements mark the cross-examinations mentioned. The case was peculiar in many respects and was distinguished by striking and extraordinary features.

The case of the *People* v. *Brown* (72 N. Y. Rep., 571) has not escaped observation, and the dawn of a new rule seems to be suggested by the forcible remarks of Chief Justice CHURCH on the subject of the protection which should be given a party while occupying the witness stand  "Especially," he said, " ought this protection to be afforded to persons on trial for criminal offences who often, by a species of moral compulsion, are forced upon the stand as witnesses, and being there are obliged to run the gauntlet of their whole lives on cross-examination, and every immorality, vice or crime, of which they may have been guilty, or suspected of being guilty, is brought out ostensibly to affect credibility, but practically used to produce a conviction for the particular offence for which the accused is being tried, upon evidence which otherwise would be deemed insufficient. Such a result is manifestly unjust, and every protection should be afforded to guard against

it." It may be in this case that the plaintiff in error was by the extended examination of his connection with the court house, and collateral subjects, prejudiced before the jury, and that objection-able features in it, if such there were, operated to his injury, and induced a general impression leading to the conviction which fol-lowed of the particular offence of which he stood charged. No conviction accomplished by this means reflects credit upon our administration of justice — indeed, the law itself is not administered in such a result, because the accused should be declared guilty only on pertinent evidence relating to the offence charged, and not upon any theory springing from ulterior subjects and affect-ing character. A bad man may be innocent of a charge preferred against him, and, if so, should not, on what is called general prin-ciples among men, be pronounced guilty. The law, in its purity, seeks to punish the offender, because he has done the wrong charged against him, and for that reason only. The value of a good character cannot either be ignored or lessened by any rule to be adopted, but some well defined limit to cross-examination should be declared by the court of last resort which will yield the protection, which even a bad man is entitled to when placed upon trial for an offence, and more particularly because the law in its humanity declares him innocent until he is proved to be guilty by the judgment of his peers. We do not feel called upon to invade the present rule, but prefer to leave it to the tribunal mentioned. Applying existing rules, we cannot say that injustice was done, or that the exceptions relating to this subject were well taken.

There are other exceptions of a kindred character to those con-sidered, but we fail to see in them such error as requires a new trial.

It becomes necessary, in conclusion, to consider the exceptions to the charge of the learned justice presiding at the trial, and to those relating to his refusal to charge as he was requested. The theory of the charge, as suggested by the learned district attorney, was, in substance, that if the defendant willfully, and with intent to defraud, set on foot the scheme of having this false bill of Davidson's made out and presenting it to the mayor, by adopting the usual method which would insure its being so pre-sented, and result in inducing the mayor to sign the warrant, and

obtain the warrant so signed, he could be convicted; otherwise not. And this theory, as we have seen, was justified by the law of the land. The charge, to which it is not deemed necessary to refer in detail, carried out this theory and gave to the defendant in its exposition the benefit and advantage of every element to which he was entitled, and was fair, liberal and complete. If the theory was erroneous, then the conviction should fail, but it was not, as we have seen, and the charge was, as suggested, comprehensive in giving to the defendant all the qualifications and doubts which the evidence created and which the jury were left to dispose of, in considering the facts according to a conscientious discharge of their duty. The last request made by the defendant's counsel, and granted, is an illustration of the readiness of the court to give the defendant the advantage of any doubt. It is as follows : "I ask your honor also to charge that the bill, or whatever you recognize as the false pretence in the case, must have exerted not only a material influence upon Mr. Hall, inducing him to sign the warrant, but must have been so extensive in its influence that he would not have signed the warrant without it."

"The Court — I so designed to charge, and think I have."

The exceptions to the charge, and to the request to charge, are, therefore, and each is unavailing to the defendant. The case was, in many respects, exceptional in facts, both on the part of the prosecution and the defence. The chain of events developing and establishing the offence was extraordinary but complete, and the defence peculiar, because of the alleged intention of the defendant to pay over the money received by him to Mr. Davidson, the long delay in making the offer to do so, and the exposition of great fraud upon the city *ad interim.* The offer thus made was subjected to the imputation that it was made in consequence of such exposition, and was not a voluntary act, and the consideration of this subject was necessarily forced upon the jury in connection with their estimate of such offer.

It may be that this element prejudiced the defendant's case ; but, under the evidence, its presence was unavoidable, because the People had a right to show, if they could, that the offer was an afterthought, superinduced by anticipated danger. A careful perusal of the whole case shows that the various issues were fully

and carefully investigated, and does not create the impression that any wrong was done to the defendant on the trial by the rules of law applied.

The judgment must therefore be affirmed.

INGALLS, J., concurred ; DAVIS, P. J., taking no part.

\* Judgment affirmed.