MACBETH–EVANS GLASS CO. v. ROSENBAUM CO. et al.

(District Court, W. D. Pennsylvania. August 5, 1912.)

No. 127.

1. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — DESIGN FOR LAMP
SHADE.
The Evans design patent, No. 41,785, for a design for a lamp shade,
discloses patentable invention when compared with the prior art; also
*held* valid as against the claim that the patentee was not the true in-
ventor, and infringed.

2. PATENTS (§ 252*) — INVENTION — DESIGNS.
Whether two designs are identical is to be determined by examining
the drawings and the manufactured article.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 540–543; Dec.
Dig. § 252.*]

3. PATENTS (§ 252*) — INFRINGEMENT — DESIGNS.
The test of infringement of a design patent is whether the two de-
signs are so like as to appear to be identical to the eyes of an ordinary
observer, and not whether differences can be observed by an expert.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 540–543; Dec.
Dig. § 252.*]

4. PATENTS (§ 252*) — INFRINGEMENT — DESIGNS — EVIDENCE.
In determining the question of infringement of a design patent, the
two articles may properly be compared as they appear when in use.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 540–543; Dec.
Dig. § 252.*]

In Equity. Suit by the Macbeth-Evans Glass Company against
Rosenbaum Company and the Jefferson Glass Company. On final
hearing. Decree for complainant.

Paul Synnestvedt and James I. Kay, both of Pittsburgh, Pa., for
plaintiff.

Weil & Thorp and A. M. Neeper, all of Pittsburgh, Pa., for de-
fendants.

YOUNG, District Judge. This is a bill filed by the Macbeth-
Evans Glass Company for infringement of design patent for lamp
shades No. 41,785, granted to H. S. Evans September 19, 1911, and
which it is alleged the defendant, the Rosenbaum Company, has
infringed. The other defendant, the Jefferson Glass Company, was
allowed to intervene and become a party defendant; it having al-
leged that it was the manufacturer of the lamp shades used by
the Rosenbaum Company and which had been sold to that com-
pany through Stinson, Kennedy & Co., who had contracted with
the Rosenbaum Company for the furnishing of the lamp shades.
It is admitted that the patent in controversy was assigned to the
Macbeth-Evans Glass Company by H. S. Evans on August 16,
1911, before its issue. We gather from Fig. 1 of the drawings ac-
companying the application for the patent that the design consisted
of a bell-shaped glass shade having a slightly concave curve from
the neck for a short distance, and then a gradual reverse convex
curve to the bottom of the shade. Upon this is formed panels and

ribs. The whole outward surface is formed into panels by narrow ribs. The ribs are triangular with the body of the shade as a base, and reaching an apex above the surface of the shade and the adjacent panel. The rib, having a pointed end, begins on the bottom rim of the shade below the adjacent panel, and gradually narrows and retreats from the adjacent panels on either side until it disappears in a narrowing groove at the neck of the shade. Fig. 2 of the drawings shows that the pointed rib is triangular, having for its base a segment of the circle passing through the different points of the rim where the panels and ribs have a common meeting point. The articles manufactured under this patent offered as exhibits by both complainant and defendant, "complainant's patent shade" and "Defendant's Exhibit of Complainant's Shade, January 19, 1912," both show that some of the ribs are triangular, reaching an apex above the adjacent panels, and some are slightly rounded or flattened. The shades are manufactured in moulds, and have a uniform surface on the entire inside, and the panels and ribs gradually increase in thickness from the top of the convex curve near the neck to the bottom of the shade. The defenses are, first, noninfringement; second, invalidity of the patent over prior art; and, third, invalidity of the patent on account of the claim that the patentee, Evans, was not the true and original inventor of the subject-matter, but that the same was invented by one Lorin W. Young. For the sake of logical consideration we shall take these up in the following order: First, the invalidity of the patent; second, whether Young was the inventor; and, third, infringement.

[1] First, as to the defense that the patent is invalid because of the prior art. Patent No. 41,785, having been issued to Evans and by him assigned to complainant without more, would be a valid patent, and the burden was therefore on the defendants to show its invalidity in the light of the prior art. Defendants undertook to do this by offering in evidence, as showing the bell-shaped contour, the narrow ribs alternating with the broad panels, and the scallops at the lower edge, the following patents: Design patent No. 26,647, issued February 16, 1897, to E. F. Caldwell; design patent No. 37,812, issued July 15, 1905, to O. A. Mygatt; design patent No. 37,424, issued May 2, 1905, to K. Booth; design patent No. 40,607, issued April 5, 1910, to O. A. Mygatt; patent No. 790,026, issued May 16, 1905, to K. Booth—and the following exhibits: Fig. 8,715, p. 31, Pettingell-Andrews Company catalogue, filed in the Patent Office February 8, 1909; plate 6, cut P 804, and plate 7, cut 800, Pettingell-Andrews Company catalogue, 1904; page 138, cut 4,229, and page 148, cut 4,715, in the Morreau catalogue 4, copyrighted 1903; page 30, cut 3,107, in Bauer catalogue, 1904; plate 4, cut 6,514½, and plate 4, cut 6,517½, in Phœnix catalogue 16; pages 589, 595, 597, 626, and 664 of the Electrical Merchandise Catalogue No. 12 of Pettingell-Andrews Company—and exhibits of manufactured shades as follows: Defendants' Exhibit narrow Sheffield design, Defendants' Exhibit wide Sheffield design, and

Defendants' Exhibit "Opallux" and "Pheno," designed by Howard E. Watkins.

The question, then, is whether there is identity of design in the patent of Evans viewed in the light of the state of the art as shown by the prior patents and by the preceding exhibits. We find the true test of identity of design laid down in Gorham Co. v. White, 14 Wall. 511, 20 L. Ed. 731, where Mr. Justice Strong says, on page 525:

"And the thing invented or produced, for which a patent is given, is that which gives a peculiar or distinctive appearance to the manufacture, or article to which it may be applied, or to which it gives form. The law manifestly contemplates that giving certain new and original appearances to a manufactured article may enhance its salable value, may enlarge the demand for it, and may be a meritorious service to the public."

An examination of the patents, figures, and manufactured shades in evidence shows that there is a great and substantial difference between the shades patented, pictured, and made under prior patents and in the prior art and the design of the Evans patent. True, they are all more or less bell-shaped, in that they are narrower at the top than at the bottom; they are all traversed or cut up by ribs narrow or broad; they are all more or less scalloped at the lower edge, and among those that are moulded or pressed the inside surface is uniform and not broken up or fluted, but the most casual and superficial examination of the exhibits in the prior art shows that there is in the patent in suit, not only a striking difference in the design of the contour of the shade arising from the convex and concave curve between the lower edge and the top of the shade, but also in the conformation of the ribs and panels, where we find the narrow rib alternating with the broad panel. The above differences are very apparent to an ordinary observer, but these differences in construction would not determine the question of identity of the Evans design with those shown by the evidence as to the prior state of the art if those differences did not produce a different effect. As is said in Gorham Co. v. White, supra, 14 Wall. 525, 20 L. Ed. 731:

"Manifestly the mode in which those appearances are produced has very little, if anything, to do with giving increased salableness to the article. It is the appearance itself which attracts attention and calls out favor or dislike."

And again on page 526 of 14 Wall. (20 L. Ed. 731):

"We do not say that in determining whether two designs are substantially the same, differences in the lines, the configuration, or the modes by which the aspects they exhibit are not to be considered; but we think the controlling consideration is the resultant effect."

[2] Giving proper consideration then to the differences above pointed out, we inquire next whether or not the effect produced upon the eye of an ordinary observer is the same. Unmistakably, if we look at the Evans design, and those other designs offered in evidence, we at once see that an entirely different effect is produced. In the Evans design, we have a new and pleasurable sensa-

tion of symmetrical beauty in contour and configuration entirely different from the sensation of beauty produced by looking at the prior designs, and this apart from the impression of beauty produced when viewing them in use with electric or other light showing through them, because we are of opinion that, in determining the validity of a patent, whether two designs are identical is to be determined by examining the drawings and the manufactured article, and that it is only in determining the question of infringement that we may resort to and consider the design in use. A comparison of the drawings in the different patents with the drawings in the Evans patent shows this manifest difference in effect. A comparison of the engravings in the catalogues offered in evidence with the drawings in the Evans patent shows the same apparent difference in effect. A comparison of the shade manufactured under the Evans patent with the manufactured shades, "narrow Sheffield," "wide Sheffield," "Opallux," and "Pheno" shows the same unmistakable difference in effect. So that from a comparison from all points of view we arrive at the conclusion that the Evans design is different from all those preceding it. We therefore hold that the patent is valid.

Second, as to the invalidity of the patent on the ground that the design was invented by Lorin W. Young, and not by Evans, the patentee. Patent No. 41,785 for the invention in controversy, having been issued to Howard S. Evans and the same having been offered in evidence, was prima facie evidence of invention and of the regularity of the issuance of the patent. Railroad v. Stimpson, 14 Pet. 448, 10 L. Ed. 535; Corning v. Burden, 15 How. 252, 14 L. Ed. 683; Blanchard v. Putnam, 8 Wall. 420, 19 L. Ed. 433; Marsh v. Seymour, 97 U. S. 348, 24 L. Ed. 963. The burden is therefore upon the defendant to overcome the presumption. Mitchell v. Tilghman, 19 Wall. 287, 22 L. Ed. 125; Singer Mfg. Co. v. Brill, 54 Fed. 380, 4 C. C. A. 374. And this must be established, not only by the weight of the evidence, but the evidence must be free from doubt. Forgie v. Oil-Well Supply Co., 58 Fed. 871, 7 C. C. A. 551; Stonemetz v. Brown (C. C.) 57 Fed. 601. Let us examine the evidence in the light of these principles to determine whether or not Young was the inventor of the patent in question.

Lorin W. Young at the time the patent was applied for and for some years prior thereto was employed by the Macbeth-Evans Glass Company as salesman. His service with them covered a period of nine years. That company was experimenting for the purpose of producing the "Alba" glass. It being desirable to provide a design which in a lamp shade would bring out the beauties of the "Alba" glass, the design of the lamp shade in controversy was made and patented by Evans. He testifies that in the fall of 1908 he was requested by Evans to get up a design for a shade which would bring out the beauties of the "Alba" glass, and that he, Young, in a short time produced a sketch showing the shape which was afterwards known as Macbeth-Evans No. 3424, and

this he handed to Evans, and has not seen it since to his recollection; that at the time he started to make the design Evans suggested that, if possible, there should be embodied in the elaboration the ribs and grooves of the "Sheffield" line of goods, at that time very popular; and that both he and Evans were very familiar with that line. He testifies that in forming this design he tried to embody the general "Sheffield" idea without exactly copying any one particular quality or shade then being manufactured by competitors, although carrying out the general line of the "Sheffield." He testifies that Fig. 1 as shown in the design to the best of his belief is the exact reproduction of his sketch. He swears positively that Evans was not the sole and original inventor of the design shown in patent No. 41,785, issued to Evans, and that he, Young, is, and that the invention of the design shown in Fig. 1 of the drawings forming part of design patent No. 41,785 was his exclusive invention. He further testifies that he had a conversation with Evans about the time the application for a patent for the shade was made, and that Evans told him that he would apply for the shade patent, and that Young should apply for the patent design for lamp shade, for which patent No. 41,680 was issued, and called in the evidence the "Hemisphere" patent. Young testifies he was the inventor of the design of that patent also. The applications for both these patents were made on December 19, 1910.

The only witness called by the defendants to testify in support of Young being the inventor of the design in controversy was Robert C. Kay, an employé of Macbeth-Evans Glass Company, who came into the employ of that company in September, 1909. He testifies that during September, 1909, Evans pointed out to him the line of reflectors manufactured by Macbeth-Evans Glass Company, and in explaining this line of reflectors he showed him No. 3,424, and said:

"This reflector was designed by our Mr. Young, whom I want you to meet, and I hope you will become as thoroughly 'Albaized' as Mr. Young and myself are."

He further testifies that the shade shown him being Complainant's Exhibit "Complainant's Patented Shade," is an exact duplicate of the shade known as No. 3,424, exhibited to him by Mr. Evans. He testifies that it was understood and granted more than once in conversation in which Evans, Young, and the witness took part that Young was the designer of No. 3,424, this in the office of the company in Pittsburgh and at the Electrical Show in Chicago. It is admitted that 3,424 is the number by which the shades manufactured under the Evans patent are known by the complainant company.

The substance, then, of Young's evidence is that in the fall of 1908, while he was in the employ of the complainant company, he was requested to make a design for a lamp shade; that alone and unassisted he made a drawing or sketch of which Fig. 1 of the patent is an exact reproduction; that he gave this sketch to Evans, and has not seen it since; and that when the patent was applied for by Evans, although Young was the inventor, he allowed Evans, upon Evans' re-

quest, to take out the patent, he, Young, to take out the other patent, known as the "Hemisphere," No. 41,680; Young being also the inventor of 'that design.

The inferences we are asked to draw from this evidence are that Young is the sole inventor of the patent in dispute, and that the sketch was made by Young, given by him to Evans, used by Evans in having the drawing, Fig. 1 of the patent, made, and that Evans knew at the time the patent was applied for that Young was the inventor, and that Evans was not, and that it was only because Young was an employé of the complainant company that he had no objection at that time to the application being made by Evans, as requested by Evans.

Howard S. Evans was called to rebut the evidence of Young, and he testified that in the fall of 1908 the "Alba" glass, which theretofore had been sold in blown goods, he thought would make a very good reflector when properly designed and pressed; that, to get an idea of how it looked in pressed form, he gave instructions to the factory at Charleroi to use a gas shade mould, a mould which the complainant company had made to meet the requirements of the Cuban market; that, when he received the shade thus made, he was convinced that a good line of reflectors could be made for "Alba" for "Tungsten," and other incandescent lamps; that he may have shown this to Young; that his recollection is that he, Evans, then sketched a shade, which he gave to Miss Lafferty, and from which developed No. 3,424, Complainant's Exhibit "Complainant's Patented Shade"; that the sketch he gave to Miss Lafferty was rather crude, and, as he did not profess to be an artist or designer, she drew the design properly, carrying out the shape and ornaments of the rough sketch, and then two models were made; that, when the models were made, he changed the ornamentation and altered the ribs; that he had no recollection of asking Young to get up a design for a shade, and no recollection of Young handing him a sketch of the shade of the patent or anything like it; that Young had no part whatever in the origination of the patent in suit that he could recollect; that Young never claimed he had any part in the origination of the design of the patent in suit. There is here, then, a denial that Young had anything to do with inventing the design, or that he made a sketch or gave a sketch to Evans, or ever claimed to have any part in the designing of the patent, but that, on the contrary, he, Evans, was the inventor of the design, based upon a moulded shade which he caused to be made, of which he made a rough sketch, and which rough sketch, under his direction, was put in more artistic form by Miss Lafferty, and from which two models were made, they being subsequently altered by Evans and the "Alba" shade, No. 3,424, being the shade of the Evans patent, was finally produced.

We have on the one side the evidence of Young asserting that he is the inventor, with the attending circumstances, and on the other side the evidence of Evans asserting that he is the inventor, with the attending circumstances. We must, therefore, look for corroboration both in the attending circumstances and in the other evidence. It is argued that this corroboration is found in favor of Young by the fact that the two patents, No. 41,785, the Evans patent, and No. 41,680,

the Young patent, for the same shade, were applied for on the same day; that Fig. 1 of the Evans patent is a reproduction of the sketch made by Young. But these are not corroborative, for, as to the application being on the same day, that might well be if Evans designed the shade of his patent and Young the shade of the "Hemisphere," his patent, both working at the same time, but for different results. The argument that there is corroboration of Young in the evidence of Young that Fig. 1 of Evans' patent is a reproduction of his sketch is not sound, because the statement that it is a reproduction depends alone upon his own evidence and rises no higher and is no more convincing than his evidence that he is the inventor, and it is in no sense corroborative evidence. More than that, we do not have his sketch, and cannot compare Fig. 1 with it, and therefore there is no corroboration. But we are required to infer from his evidence that the sketch given by Evans to Miss Lafferty was the Young sketch, and, as that resembles Fig. 1, we are asked to conclude that Young is corroborated. We cannot infer that the Lafferty exhibit was made from the Young sketch because there is no evidence that it was, but, on the contrary, the evidence is both by Evans and Miss Lafferty that the Lafferty sketch was made from a rough drawing which Evans testifies he made, and which Miss Lafferty says she used under Evans' direction. So we find nothing in the attending circumstances to corroborate Young.

Do we find in the attending circumstances anything to corroborate Evans? We think we do in the evidence of Miss Lafferty. As has been said, she testifies that Evans gave her, she being the designer for the complainant company, a rough sketch shortly after October 1, 1908; that she used this sketch under the direction of Evans, and she produces the sketch which she made at the time, showing the design as afterwards reproduced in Fig. 1 of the Evans patent. We have here Evans corroborated partly by the circumstance of the sketch and by the evidence of Miss Lafferty. Were we to decide upon the evidence of Young and Evans 'alone, bearing in mind that the burden of proof is upon the defendant and that no doubt must be in the mind of the court upon the evidence, and taking into consideration that Evans is corroborated by the attending circumstances and Young is not, we would be driven to the conclusion that the defendants have not overcome the presumption arising from the issuance of the patent. But let us look further for corroboration of Young and Evans in the evidence given by other witnesses. It is argued that Young is corroborated by the evidence of Robert C. Kay, who testifies that when he came into the employ of the complainant company in September, 1909, Evans pointed out to him shade No. 3,424, the Evans patent, and said that Young had designed it; that on numerous occasions he talked with Evans and Young, and that whenever "Alba," No. 3,424, was mentioned, it was understood and granted that Young was the designer of that shade; that at the office of the complainant company in the Wabash Building, Pittsburgh, the subject was discussed, and also at the Electrical Show in Chicago, and that at that time it

was understood that Young was the designer of the shade. This evidence is very weak as corroborative evidence. The evidence of pointing out the shade 3,424 among the samples is weak because there were many samples, as many as 250 different styles in the room, and among them some of Young's, who is admitted to have made designs, and the witness may easily have been mistaken. His evidence of conversation is weak, also, because he fails to give the conversation or any part of it, but gives only his conclusions, as that it was "granted" or "understood." So we do not find any persuasive corroboration of Young in the only evidence given by the only witness offered in corroboration. On the other side, we have Evans corroborated by the evidence of Miss Lafferty as to the sketch, the sketch itself, and that she never heard while in the employ of the complainant company that Young claimed to be the inventor of the design in question; by the evidence of Lissfelt, an employé of complainant company, who corroborates Miss Lafferty, testifying that he heard Evans giving instructions to Miss Lafferty in making the final drawings of the shade, and who also testifies he never heard anybody else, aside from Evans, referred to as the originator of the design, never heard Young claim it, nor ever heard anybody intimate that Young was the inventor of the shade, by the evidence of Macbeth of the complainant company, who testifies he kept in touch with the business, and that no shape or design could progress towards the making without coming under his supervision; that he never knew of Young asserting that he was the originator of the design shown in Complainant's Exhibit "Complainant's Patented Shade."

We have, then, on the one side only the evidence of Young uncorroborated by the attending circumstances, and but weakly corroborated in but one particular, namely, by the pointing out in the sample room of the shade in question by the witness Kay, and on the other side the evidence of Evans corroborated partly by the attending circumstances, by the evidence of Miss Lafferty, Lissfelt, and Macbeth. Not only have defendants not overcome the presumption arising from the issuance of the patent to Evans, but the weight of the evidence is so greatly in favor of the claim that Evans is the original inventor of the shade in suit that we arrive without hesitation at the conclusion, and therefore find that Evans is the original and first inventor of the design for which patent No. 41,785 was granted to him. Let us now pass to the last question, that of infringement.

The complainant produced and offered in evidence its manufactured shade made under the Evans patent, and marked "Complainant's Exhibit Complainant's Patented Shade," and also the manufactured shade which it is alleged defendants are manufacturing and selling, and marked "Complainant's Exhibit, Defendant's Construction," and the testimony of many witnesses was based upon a comparison of the Complainant's Exhibit with the exhibit produced as the infringing article. Objection is made by defend-

ants to all this evidence upon the ground that Complainant's Exhibit "Complainant's Patented Shade," does not embody the design described and shown in complainant's patent No. 41,785, and therefore a comparison between it and defendant's construction is improper, and the testimony based upon such comparison should be suppressed. This question should be determined in limine, because it is an important one, and, if the premises are true, the conclusion must follow that the testimony be suppressed, which would remove from the case much testimony that is necessary to a decision. It is alleged that Complainant's Exhibit "Complainant's Patented Shade," offered in evidence, does not embody the design for the lamp shade described and claimed in complainant's design patent No. 41,785, in that:

"(a) The narrow ribs of said exhibit are not of the form and design shown in Figures 1 and 2 of said design patent because '(1) they are not in the form of prisms having an angular cross-section, having the lines of their apexes or ridges prolonged and divided at their ends so as to define the terminals of the broad ribs of said exhibit as shown and defined in Figure 1 of the drawing of said patent; on the contrary, said narrow ribs are rounded in cross-section, their upper surfaces being curved instead of angular, and said narrow ribs disappear and vanish in the bowl of said exhibit without the lines of their apexes being continued to the shoulder of said exhibit to define the terminations of the broad ribs thereof as indicated above.' "

An inspection of the exhibit shows that some of the narrow ribs are angular in cross-section and some are slightly rounded, but this difference is so slight and so probably the result of careless moulding that it deserves no consideration. The narrow ribs do disappear in the bowl of the shade at the bottom of the concave groove, but an inspection of Fig. 1 of the drawing shows the same. There is nothing in the first reason.

"(2) The terminations of the narrow ribs of said exhibit and the bottom edge thereof are not in accordance with the design shown in Figures 1 and 2 of the patent No. 41,785. The terminations of the narrow ribs of the exhibit are formed in V-shaped points, with the lines at the apexes of the V's extending radially entirely across the bottom edge of the exhibit, while Figure 2 of the drawing of said patent shows the apexes and ridges of the narrow ribs or prisms stopping short of the bottom edge of the exhibit and terminating in a half pyramid with no radial line extending across the bottom edge of said exhibit. But the points of said narrow ribs in the drawings of said patent in Figure 2 thereof terminate in the side of said exhibit opposite rectangles which occur in the bottom edge of said exhibit opposite each of said narrow ribs or prisms. The rectangles just referred to are entirely absent from said exhibit."

These differences are only discoverable by the closest and most minute inspection, and in our opinion will afford no ground for excluding the exhibits.

"(b) The broad ribs of said exhibit do not reach the shoulder thereof by considerable distance, but disappear and vanish in the bowl of said exhibit without any definition by lines formed by the prolongation of the apexes or ridges of the narrow ribs or prisms such as are shown in Figure 1 of the drawing."

An inspection and comparison of the exhibit with the drawing Figure 1 of the Evans patent does not reveal to us the differences claimed. Altogether we are clearly of opinion the exhibit was properly received in evidence, and that the testimony founded on a comparison of that exhibit with Complainant's Exhibit "Defendant's Construction," the infringing article, was properly received, and should not be suppressed.

The evidence shows that complainant began the manufacture and sale of lamp shades under the Evans patent in the spring of 1909, and that they became immediately popular, so much so that the sales the first year amounted to $100,000, and that they were much more so in February, 1912, at the time of the taking of the testimony, and that their popularity was not attributable to the fact that they were manufactured of "Alba" glass, because the evidence shows that other lamp shades, seven different designs, manufactured out of "Alba" glass by complainant and offered for sale, some of them for one year and some for three years, were not together 1 per cent. of the sales under the Evans patent. The evidence also shows that in the spring of 1910 the Jefferson Glass Company, one of the defendants, manufactured and put upon the market a similar glass called "Luceo," and which is shown by the evidence to be manufactured by that company through a secret formula and process belonging to the complainant company, and from which it manufactured the "Alba" glass, the use of which formula and the disclosing of which has been prohibited by the courts of Allegheny county in this district; both the Jefferson Glass Company and Harry Schnelbach, who possessed the secret process as an employé of complainant's, and carried and disclosed it to the Jefferson Glass Company and who were using it, being restrained by an injunction of that court. The evidence also shows that the Jefferson Glass Company manufactured, put upon the market, and sold lamp shades made of the "Luceo" glass and called "Luceo," under a patent granted to Harry A. Schnelbach February 6, 1912, applied for September 23, 1911, and numbered 42,151, and that these lamp shades were installed in some places for demonstration and in other different places, stores, and buildings for lighting, and that the defendant, the Rosenbaum Company, entered into a contract for the installation of electric lights with Stinson, Kennedy & Co., and that on September 12, 1911, that company ordered from the Jefferson Glass Company for that contract a large number of their lamp shades, and that on September 14, 1911, the Jefferson Glass Company shipped to Stinson, Kennedy & Co., for the Rosenbaum Company contract, many dozens of their "Luceo" lamp shades of the value of $362.92, which were received by Stinson, Kennedy & Co. and installed in the store of the Rosenbaum

Company; the lamp shades of complainant being removed as they at that time were installed there. The evidence thus clearly shows the fact of infringement if the lamp shades manufactured and sold by the Jefferson Glass Company, one of the defendants, and bought and used by the Rosenbaum Company, the other defendant, are an infringement of the Evans patent.

[3] The principles upon which we may determine this controversy as to infringement are the same as those we have referred to for the purpose of determining the validity of the patent, except perhaps as to the use of expert testimony and observation of the manufactured article in use. The leading case upon this question and which clearly establishes the principles which must apply in this case is that of Gorham Co. v. White, 14 Wall. 526, 20 L. Ed. 731, supra, where Mr. Justice Strong says:

"We are now prepared to inquire what is the true test of identity of design. Plainly it must be sameness of appearance; and mere difference of lines in the drawing or sketch, a greater or smaller number of lines, or slight variances in configuration, if sufficient to change the effect upon the eye, will not destroy the substantial identity. An engraving which has many lines may present to the eye the same picture and to the mind the same idea or conception as another with much fewer lines. The design, however, would be the same. So a pattern for a carpet or a print may be made up of wreaths of flowers arranged in a particular manner. Another carpet may have similar wreaths, arranged in a like manner, so that none but very acute observers could detect a difference. Yet in the wreaths upon one there may be fewer flowers, and the wreaths may be placed at wider distances from each other. Surely in such a case the designs are alike. The same conception was in the mind of the designer, and to that conception he gave expression. If, then, identity of appearance, or (as expressed in McCrea v. Holdsworth) sameness of effect upon the eye, is the main test of substantial identity of design, the only remaining question on this part of the case is whether it is essential that the appearance should be the same to the eye of an expert. The court below was of opinion that the test of a patent for a design is not the eye of an ordinary observer. The learned judge thought there could be no infringement unless there was 'substantial identity' 'in view of the observation of a person versed in designs in the particular trade in question—of a person engaged in the manufacture or sale of articles containing such designs—of a person accustomed to compare such designs one with another, and who sees and examines the articles containing them side by side.' There must, he thought, be a comparison of the features which make up the two designs. With this we cannot concur. Such a test would destroy all the protection which the act of Congress intended to give. There never could be piracy of a patented design, for human ingenuity has never yet produced a design, in all its details, exactly like another, so like that an expert could not distinguish them. No counterfeit bank note is so identical in appearance with the true that an experienced artist cannot discern a difference. It is said an engraver distinguishes impressions made by the same plate. Experts, therefore, are not the persons to be deceived. Much less than that which would be substantial identity in their eyes would be undistinguishable in the eyes of men generally, of observers of ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which men of ordinary intelligence give. It is persons of the latter class who are the principal purchasers of the articles to which designs have given novel appearances, and if they are misled, and induced to purchase what is not the article they supposed it to be, if, for example, they are led to purchase forks or spoons, deceived by an apparent resemblance into the belief that they bear the 'cottage' design, and therefore are the production of the holders of the Gorham, Thurder, and Dexter patent, when in fact they are not, the patentees are injured, and that advantage of a market

which the patent was granted to secure is destroyed. The purpose of the law must be effected, if possible; but plainly it cannot be if, while the general appearance of the design is preserved, minor differences of detail in the manner in which the appearance is produced, observable by experts, but not noticed by ordinary observers, by those who buy and use, are sufficient to relieve an imitating design from condemnation as an infringement. We hold, therefore, that if, in the eye of an ordinary observer giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."

This case has been followed from that time to the present and repeatedly cited as authority in many cases. Ripley v. Elson (C. C.) 49 Fed. 927. In Hutter v. Broome (C. C.) 114 Fed. 655, in this circuit, Judge Gray stated the principles as follows:

"A careful inspection, however, of the design patent and of the exhibits of the defendant's stopper, convinces me that these differences, whether between the drawing of the design in the patent and complainant's actual structure or between either of those and defendant's structure, are too minute and unimportant to overcome the charge of infringement. The design of the patent and the alleged imitation must be viewed as wholes, and judged by the impression made upon the eye of an intelligent observer not unaccustomed to observe the same. If to such an eye, for instance, that of a dealer in the articles in question, or one interested commercially in their use, the appearance of the two articles is so similar as that one could readily be mistaken for the other, ground for alleging infringement may be said to exist. And this is so notwithstanding that real, but minute, differences of outline, not affecting the general contour and form as apparent to the ordinary observer, may have been discovered by expert examiners. The testimony of several witnesses, accustomed to handle such goods, establishes such substantial similarity between the design of complainant's stopper as protected by his patent, and that of defendant's stopper, as to justify and support the charge of infringement."

In Friedberger-Aaron Mfg. Co. v. Chapin (C. C.) 151 Fed. 264. in this circuit, Judge Holland said:

"There is an identity of appearance or sameness of effect upon the eye, and this resemblance we think is so close that it would readily deceive the ordinary observer or purchaser, and this is sufficient to establish the claim of the complainant that the defendant has infringed the design patented. It is very easy to distinguish between the two designs when brought together, but they are so near alike in appearance that the ordinary observer, giving such attention as a purchaser usually gives, would undoubtedly be deceived by the resemblance of the defendant's design to that of the complainant's. This resemblance is so close as to deceive such an observer and sufficient to induce him or her to purchase one, supposing it to be the other, a result held to be the test of the question of infringement. Gorham Co. v. White, 81 U. S. 511, 20 L. Ed. 731."

In Scofield v. Browne, 158 Fed. 305, 85 C. C. A. 556, Judge Dallas, speaking for the Circuit Court of Appeals for this circuit, said:

"It is not for us to say that this 'most delicate monster' does not 'please the eye of the beholder,' for the proofs show that it has enhanced the salable value and enlarged the demand for the trinkets it was intended to adorn. Walker on Patents, § 22. And as to infringement there can be no reasonable doubt. The head of the defendants does not materially differ from that of the patent, being distinguishable from it only by the absence of the ray-like members, 'e'; and we cannot suppose that the removal of these appendages was at all likely to be observed by an ordinary purchaser. Gorham Co. v.

White, 14 Wall. 511, 20 L. Ed. 731. The two designs are certainly very much alike in general appearance. Each is 'an ornamental head,' and both, if either, may be regarded as that of 'a carnivorous animal,' and each has the mouth open to expose the teeth, and, 'like the toad, ugly and venomous, wears yet a precious jewel in his head.' The only difference worthy of mention, as has been noted, is in what may be called the whisker portion of the face, and it is not possible to believe that the intention of the defendants in creating this difference was to make a design 'so various that the mind of desultory man, studious of change and pleased with novelty, might be indulged.'"

Graff et al. v. Webster (C. C. A.) 195 Fed. 522, decided March 11, 1912, is the last citation of Gorham Co. v. White brought to our notice, and there Judge Coxe, sitting in the Circuit Court of Appeals for the Second Circuit, says:

"The defendants do not contend that the prior art renders the patents totally invalid, but they contend that, in view of that art, the designs show only a slight variation of old compositions or arrangements, and the claims must be construed to cover 'the specific elements there employed and their specific arrangement.' In other words, it is their contention that only a Chinese copy will infringe. We cannot agree with this contention. It is true that a number of dishes made of china, silver, and plated ware are produced, together with drawings and engravings of other dishes, each bearing certain features in common with the designs of the patents, but possessing such marked dissimilarities that even an ignorant or nonobservant purchaser could not mistake the one for the other. There is no reason, therefore, for limiting the patented designs to the identical structures shown and described. If the ordinary observer would purchase the defendants' dishes, believing them to be those of the complainant, it is enough. This is the rule laid down in Gorham Co. v. White, 14 Wall. 511, at page 528 (20 L. Ed. 731). The court says: 'The purpose of the law must be effected if possible; but plainly it cannot be if, while the general appearance of the design is preserved, minor differences of detail in the manner in which the appearance is produced, observable by experts, but not noticed by ordinary observers, by those who buy and use, are sufficient to relieve an imitating design from condemnation as an infringement. We hold, therefore, that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one, supposing it to be the other, the first one patented is infringed by the other.'"

The principles which we deduce from these cases as applicable to the case at bar are distinctly stated by Judge Blatchford in Jennings v. Kibbe (C. C.) 10 Fed. 669, 20 Blatchf. 353, thus:

"In Gorham v. White, 14 Wall. 511 [20 L. Ed. 731], the Supreme Court considered directly the question of identity in regard to a patent for a design. It held that the true test of identity of design is sameness of appearance, in other words, sameness of effect upon the eye, that it is not necessary that the appearance should be the same to the eye of an expert, and that the test is the eye of an ordinary observer, the eyes of men generally, of observers of ordinary acuteness, bringing to the examination of the article, upon which the design has been placed, that degree of observation which men of ordinary intelligence give."

[4] The true tests of identity are therefore, first, sameness of appearance; second, the eye of an ordinary observer, an observer of ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which men of ordinary intelligence give. As much testimony is

based upon a comparison of defendant's infringing shade with complainant's patented shade, while both were illuminated by electric lights within, and, as objection was made to this evidence, we are required to determine whether such comparison is allowable. This was clearly settled, not only in accordance with sound reason, but authoritatively for this circuit in the case of Phœnix Knitting Works v. Hygienic Fleeced Underwear Co. (C. C. A.) 194 Fed. 696, where Judge Gray says, on page 699:

"It seems somewhat absurd to claim such configuration as part of an ornamental design which is only visible when the article to which it pertains is not in use. When in use, it is the surface ornamentation alone that appeals to the eye, and the connecting neck band might be supplied in other ways than by a narrowed portion of the material of which the scarf is made. The design must be ornamental when the scarf is on the neck of the wearer, and not be such as to only fulfill its purpose as an ornamental design when it is lying flat upon a table."

The evidence shows that both the infringing shade and the Evans shade were exhibited for sale while lighted, and it is while lighted that the proposed purchaser will observe them. The evidence, therefore, based upon such a comparison was proper. The evidence in this case was given both by experts and by ordinary observers. We have carefully read all the evidence, have examined Complainant's Exhibit "Complainant's Patented Shade," and Complainant's Exhibit "Defendant's Construction," and have compared the one with the other. There are differences which are easily seen when one's attention is called to them. The narrow ribs of complainant's shade are triangular; those of the defendant, rounded. The narrow ribs of the former disappear in the bowl. Those of the latter continue through the bowl to the neck. The panels of the former are only slightly defined by the narrow ribs from the top of the convex curve to the neck; while those of the latter are well defined from the bottom of the shade to the top. The narrow ribs of the former at the lower terminal extend beyond the scallops of the broad panel, and are pointed; while those of the latter at their bottom terminal all round do not extend beyond, but stop short of the scallop of the broad panel. The concave curve of the former at its junction with the convex curve is more acute than in the latter. These are differences which are easily observable when pointed out.

There are some other points in which the two do not resemble each other pointed out by the expert. But it is not by the eye of the expert that we are to determine, but it is in the eye of the ordinary observer we must look for the resemblance. As pointed out above, we observe the points of difference referred to by a comparison of the two exhibits placed before us, and not in use or lighted up. The evidence in the case shows that these points of difference were observed by the nonexpert witnesses, who testified when their attention was called to them, and they were pointed out by the expert witnesses who testified; such experts being persons engaged in the illuminating business. We are well satisfied not only

by the evidence, but by our own examination, comparison, and observation, that the differences would not be observed by an ordinary observer of ordinary acuteness, giving the attention which such a purchaser usually gives, but the resemblance would be such as to deceive such an observer, inducing him to purchase one supposing it to be the other, all this upon either an inspection of the shades separately or upon a comparison of one with the other. But in use and while lighted up for demonstration or installed for the purpose of illumination the resemblance is most striking. The contour then of the two shades appears the same. The reflection from both is alike. The broad panels diffuse the light exactly the same. The narrow ribs cause the narrow dark band between the lighter broad panels, just alike from the bottom to the top of the shades, in complainant's the darker band being carried to the holder by the groove and in the defendant's by the rib. The evidence shows that, not only did the resemblance appear to ordinary observers, but that those engaged in the business, and therefore looking with expert and trained eyes upon the shades, easily mistook one for the other.

From all the evidence we have no difficulty in arriving at the conclusion that, not only would the ordinary observer proposing to purchase and giving that attention to the article he intended to purchase as such a purchaser usually gives see a resemblance such as to deceive him and induce him to purchase one supposing it to be the other, but that persons were deceived and purchased one believing they had purchased the other. Employés of complainant company, engaged in selling complainant's shades, were deceived, supposing those they saw illuminated were the "Alba," when, in fact, they were the "Luceo." Under the evidence, therefore, the patent granted to Evans, No. 41,785, is infringed by the patent granted to Schnelbach, No. 42,151, and the defendants, the Rosenbaum Company, and the Jefferson Glass Company, have infringed the rights secured to complainant under the Evans patent, and said complainant is entitled to an injunction restraining defendants from further violation of complainant's rights and further infringement of said patent, and is entitled to have such further relief as is prayed for in its bill of complaint, including an accounting.

The defendants have insisted that the complainant has not marked shades in accordance with the requirements of the act of Congress (section 4900). As this only affects the question of damages, it might well be passed until an accounting is under consideration; but, as the evidence establishes that the Rosenbaum Company upon October 10, 1911, were notified of the complainant's patent, and a copy of the patent enclosed with such notice, it would seem that damages may be recovered for infringement, if proof is made that the defendants were duly notified of the infringement, and continued after such notice to use the article so patented.

Let a decree be drawn in accordance with this opinion.